FILED

07 DEC -3 PH 3: 38

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  MICHAEL I. SPIEGEL – CBN 32651
2  CHARLES M. KAGAY – CBN 73377
   WAYNE M. LIAO – CBN 66591
3  SPIEGEL LIAO & KAGAY
4  388 Market Street, Suite 900
   San Francisco, California 94111
5  Telephone: (415) 956-5959
6  Fax: (415) 962-1431

E-filing

7  Attorneys for Plaintiff,
8  LOUISIANA WHOLESALE DRUG COMPANY, INC.

9        UNITED STATES DISTRICT COURT

10       NORTHERN DISTRICT OF CALIFORNIA

11

12
   LOUISIANA WHOLESALE DRUG
13 COMPANY, INC., on behalf of
   itself and all others similarly
14 situated,
15
16                    Plaintiff,
17        v.
18 ABBOTT LABORATORIES,
19
20                    Defendant.
21
22

Case No.:

CV 07     6118

**CLASS ACTION COMPLAINT**

JCS

JURY TRIAL DEMANDED

23              **NATURE OF THE ACTION**

24      Plaintiff Louisiana Wholesale Drug Company, Inc., brings this class

25 action on behalf of itself and all others similarly situated to challenge

26 defendant Abbott Laboratories' unlawful acts which have enabled it to impede

27 competition in the markets for (a) protease inhibitors ("PIs") and (b) PI

28 boosters, which are two separate types of drugs that are used to treat medical

Class Action Complaint                                    1

1   disorders caused by the human immunodeficiency virus, or HIV. As set out
2   below, Abbott's illegal conduct has enabled it to: (a) improperly impede the
3   development of PI-boosters that would compete with Abbott's drug Norvir,
4   thereby enabling Abbott to illegally maintain and extend its monopoly for PI-
5   boosters and (b) impede or hamper competition from other companies' PI
6   drugs which would compete with Abbott's Kaletra product. As alleged below,
7   because of Abbott's misconduct, Plaintiff and the other class members have
8   been caused to pay artificially-inflated, supra-competitive prices for both
9   Norvir and Kaletra.

10                          **PARTIES**

11          1.      Plaintiff Louisiana Wholesale Drug Company, Inc. ("LWD" or
12  "Plaintiff") is a corporation organized under the laws of the State of Louisiana
13  and is located at 20851-49 South Service Road, in Sunset, Louisiana 70584.
14  During the relevant period, Plaintiff purchased Norvir and Kaletra directly
15  from Abbott, and was injured as a result of the anti-competitive conduct
16  alleged herein.

17          2.      Defendant Abbott Laboratories ("Abbott") is a corporation
18  organized and existing under the laws of the State of Illinois and having its
19  principal place of business in Abbott Park, Illinois. Abbott is engaged in the
20  development, manufacture and sale of pharmaceutical and nutritional products.
21  Abbott has operations in six states, including several in this District.

22  **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

23          3.      This action arises under section 2 of the Sherman Act, 15 U.S.C.
24  § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The
25  Court has subject-matter jurisdiction pursuant to 28 U.S.C. 1331 and 1337(a).

26          4.      Venue is proper in this Court pursuant to section 12 of the
27  Clayton Act, 15 U.S.C. § 22, because Abbott is an inhabitant of this District,
28  has business locations in this district, has transacted and continues to transact

Class Action Complaint                                                    2

1  business in this District, has committed and continues to commit
2  anticompetitive acts in this District. Venue is therefore also proper under 15
3  U.S.C. §§15, 22, and 26, and is also proper under 28 U.S.C. § 1391.

4      5.    Intradistrict assignment is proper in the San Francisco/Oakland
5  Division, pursuant to L.R. 3-2(c) & (d), because a substantial part of the events
6  which give rise to the claim occurred in Alameda, Contra Costa, Del Norte,
7  Humboldt, Lake, Marin, Mendocino, Napa, San Francisco, San Mateo and
8  Sonoma counties.

9  **TRADE AND COMMERCE**

10     6.    The pharmaceutical products at issue in this case are sold in
11  interstate commerce, and the unlawful activities alleged in this Complaint have
12  occurred in, and have had a substantial effect upon, interstate commerce.

13  **FACTUAL BACKGROUND**

14     7.    PIs are considered the most powerful treatment in the medical
15  battle against HIV and the disorders it causes, including acquired immune
16  deficiency syndrome (AIDS).  These drugs work by blocking the action of
17  protease, an enzyme needed for HIV to reproduce and infect other cells.

18     8.    Although PIs present an effective treatment, they have several
19  impediments, including: pill burden, dietary requirements, and severe side
20  effects.  Each PI presents different degrees of impediment and efficacy.  In
21  addition, patients develop resistance to certain PIs—a significant challenge to
22  the treatment of HIV—as the disease progresses

23     9.    There are several PIs currently on the market, including Norvir,
24  manufactured by Abbott and introduced in 1996, and Kaletra, also
25  manufactured by Abbott and introduced in 2000.  Kaletra is a combination
26  drug consisting of Norvir and another Abbott PI, whose chemical or generic
27  name is lopinavir. As explained below, while Norvir is a PI that was originally
28  introduced in 1996 as a stand-alone treatment, as a result of subsequent

1  discoveries its principal use today is to boost the therapeutic effects (and
2  reduce the required dosage) of other PIs.

3          10.    Abbott developed Norvir with the assistance of a National
4  Institutes of Health grant and spent only about $15 million of its own funds on
5  pre-approval clinical trials for the drug.  By the end of 2001, Norvir had
6  generated cumulative sales for Abbott of more than $1 billion.

7          11.    After Norvir's release, it was discovered that, when used in small
8  quantities with another PI, Norvir would boost the anti-viral effects of the
9  other PI.  Not only did a small dose of Norvir make other PIs more effective
10 and decrease side effects associated with high doses, but it also slowed down
11 the rate at which HIV developed resistance to the effects of PIs. Recent
12 research has also shown significant benefits from the use of boosted PI
13 combinations, especially for patients who experience failure of treatments
14 combining PIs with other anti-HIV drugs.  Such treatment failures are marked
15 by the emergence of drug-resistant mutations that limit the benefits of other
16 drugs in the future, because of cross-resistance among HIV medications.
17 When patients experience failure of initial boosted PI combinations, there is no
18 evidence of PI resistance and, moreover, there is less resistance to other drugs
19 in the combination.  Hence, by using Norvir as a booster, physicians can
20 maximize the treatment options remaining for the patients experiencing
21 treatment failure.  In addition to its direct therapeutic benefits, a regimen
22 consisting of a PI boosted by Norvir improves convenience for patients in
23 comparison to an unboosted regimen by reducing the required dosage of the PI
24 and lessening food restrictions, both important factors in ensuring adherence to
25 HIV antiviral therapy

26         12.    With respect to its "boosting" purposes, Norvir is by far the
27 dominant PI booster, and because of Abbott's misconduct alleged below there
28 are currently no practical substitutes for Norvir on the market.  Prior to the

Class Action Complaint                                                          4

1 | conduct alleged herein, Abbott never before sought to use its intellectual
2 | property rights to prevent competitors from creating and selling PIs for use
3 | with Norvir.   Furthermore Abbott has disclaimed such a use from the
4 | exclusionary scope of its patent rights. *See In Re Abbott Laboratories Norvir*
5 | *Antitrust Litigation*, 442 F.Supp.2d 800,  807-810 (N.D. Cal. 2007). Instead,
6 | Abbott actively induced competitors to buy licenses from Abbott for the right
7 | to label and market their PIs to be boosted by, or co-administered with, Norvir.
8 | The royalties associated with these licenses were and are a direct function of
9 | each competitor's costly and time-intensive clinical trials and other testing for
10 | purposes of FDA approval. On account of such licensing, and in exchange for
11 | mutual good faith promises and benefits related to the future availability and
12 | pricing of Norvir, substantially all other PI manufacturers chose to forego
13 | developing or testing other potential PI boosters, and instead standardized
14 | clinical trials and testing of their PIs solely in conjunction with Norvir.  Based
15 | on Abbott's course of conduct, and after these other manufacturers incurred
16 | substantial sunk costs achieving FDA approval for their PIs for co-
17 | administration with Norvir, Norvir became the *de facto* standard boosting
18 | agent. As a result, no currently available PI has been approved for co-
19 | administration with any other booster except Norvir.

20 |        13.     As noted above, Abbott also markets Kaletra, which consists of
21 | Norvir and another Abbott PI, lopinavir, combined in a single pill. Kaletra is
22 | lopinavir boosted by Norvir. Although effective and widely used, Kaletra has
23 | significant side effects, including hyperlipidemia, which renders patients more
24 | vulnerable to heart attacks and strokes.

25 |        14.     Thus, in the "Booster Market," Norvir is practically the only
26 | product available, while in the "Boosted PI Market", Kaletra competes with
27 | other PIs, each of which can be prescribed, dispensed and taken in conjunction
28 | with Norvir.   This creates a situation in which the same firm, Abbott,

1  participates in two closely related markets, with the product sold in one of the
2  two markets being an input or component of the product sold in the other
3  market. By eliminating competition in the market for sales of the input or
4  component product (Norvir), Abbott has been able to not only artificially
5  maintain and expand Norvir's monopoly position in the Booster market, but
6  also use its improperly-maintained monopoly position in the Booster Market to
7  disadvantage competitors that sold alternatives to Kaletra in the Boosted PI
8  Market, thereby improperly maintaining (or attempting to maintain) Kaletra's
9  dominant position in the Boosted PI market.

10  ## ABBOTT'S ANTICOMPETITIVE CONDUCT

11       15.     Prescriptions for Kaletra rose steadily from its introduction in
12  September 2000 through mid-2003, at which point it enjoyed approximately a
13  75% share of the boosted PI market. During this time, however, Abbott was
14  aware that other pharmaceutical companies -- such as GlaxoSmithKline
15  ("GSK") and Bristol-Meyers-Squibb ("BMS") – were developing competing
16  PI products that would take market share from Kaletra and/or force Abbott to
17  reduce Kaletra's price. Abbott was aware at this time that while the PIs that
18  GSK and BMS were developing could potentially benefit from use with a
19  booster, Abbott's competitors had not committed to developing their products
20  for use with Norvir. These other PI competitors had not yet spent the vast
21  sums of money and time conducting the required clinical trials and other
22  testing for FDA labeling and promotion of their drugs for co-administration
23  with *any* booster, much less had they foregone all such opportunities save
24  Norvir.

25       16.     As a result of the foregoing, Abbott realized not only that
26  Kaletra's dominance of the boosted PI market was about to be threatened, but
27  also that Norvir's status as the dominant product in the Boosting Market could
28  be threatened as well if Abbott's competitors could develop: (a) PIs that did

1  not need to be boosted, (b) new drugs which could be used and marketed as a

2  booster that would compete with Norvir; and/or (c) PIs that could be used with

3  various existing chemicals (such as SSRIs or grapefruit juice) which already

4  exist on the market and which could have the affect of boosting these new PIs,

5  even though those other chemicals are not technically labeled and sold as

6  "boosters".  Abbott also realized, conversely, that if competing PIs were

7  developed solely for use with Norvir, Abbott could gain two benefits in that

8  other competing booster technology would not be developed, and the existence

9  of these other Norvir-compatible PIs on the market would simultaneously

10  increase Norvir's usage and sales.

11        17.    In 2001, Abbott approached GlaxoSmithKline ("GSK") to

12  demand that it secure a license to allow GSK to promote its existing PIs, as

13  well as PIs it had under development, with Norvir.  GSK acquiesced to this

14  demand, procuring a license from Abbott in December 2002. Under the

15  agreement, GSK paid substantial sums of money in exchange for the right to

16  promote the use and administration of its PIs with Norvir.  GSK paid such

17  sums not only in terms of royalties to promote its PIs products with Norvir, but

18  also by foregoing royalties on other products that GSK licensed to Abbott at

19  the same time.  At this point Abbott had never increased Norvir's price by

20  more than 4% per year.  When GSK entered into the December 2002 Norvir

21  license with Abbott, GSK relied on Abbott's good faith not to substantially

22  deviate from its prior course of conduct.  In fact, had GSK known that Abbott

23  would substantially reduce Norvir's availability (such as by raising its prices to

24  irrational levels), GSK would have viewed the agreement as illusory and

25  would not have entered into it because it would effectively make GSK a

26  hostage to Abbott's coercive control over the Norvir supply.

27        18.    On information and belief, other pharmaceutical companies,

28  including Bristol Meyers Squib ("BMS"), took similar licenses allowing the

Class Action Complaint                                                        7

1   promotion of their PIs with Norvir during the same timeframe and under the
2   same circumstances.

3       19.     In June 2003, Bristol-Myers Squibb introduced Reyataz, a PI
4   designed to be boosted by Norvir. In October 2003, GSK introduced Lexiva,
5   another PI designed to be boosted by Norvir. Studies showed that, when
6   boosted with Norvir, the new PIs were as effective as Kaletra, and were more
7   convenient because they required less frequent dosing and/or smaller dosages.
8   Moreover, clinical trials showed that with Reyataz, the effective boosting dose
9   of Norvir was reduced from a 200-to-400 milligrams a day range to only 100
10  milligrams a day. As a result, beginning in the second half of 2003, both
11  Reyataz and Lexiva began to make steady inroads into Kaletra's share of the
12  boosted PI market, while Kaletra's share of the boosted PI market accordingly
13  began to decline and the necessary dosage of Norvir as a booster also declined.
14

15      20.     Abbott was well aware of the competitive threat posed by
16  Reyataz and Lexiva and had in fact anticipated it. Abbott's efforts to ensure
17  that competitors did not develop new boosters and/or develop their PIs for use
18  other existing chemicals, meant that: (a) Abbott had maintained its monopoly
19  power in the booster market by ensuring that there would be no substitutes for
20  Norvir; and (b) ensured that competing PI products (such as Lexiva and
21  Reyataz) had a competitive Achilles heel because much of their effectiveness
22  relied on their use with Norvir. Consequently, on December 3, 2003, Abbott
23  raised the wholesale price of Norvir by approximately 400%, from $205.74 to
24  $1,028.71 for a 120-count bottle of 100 mg capsules. However, Abbott did not
25  raise the price of Kaletra, which incorporates Norvir. In effect, Abbott raised
26  the price of Norvir only when it is used to boost a non-Abbott PI. By
27  instituting this enormous price hike, Abbott drastically increased the cost of
28  combinations using Norvir to boost competing PIs. The annual cost of Norvir

1  needed in such a combination increased by $6,258 per year for PIs such as
2  Lexiva requiring twice-daily dosing of Norvir. For Aptivus (tipranavir), a new
3  PI marketed by Boehringer Ingelheim, the optimal Norvir booster dose
4  increased by more than $12,000 per year.

5      21.    This tremendous increase in the price of Norvir was made
6  possible by Abbott's conduct in deceptively leading PI manufacturers to rely
7  solely on Norvir for boosting purposes. Abbott waited until after these other PI
8  manufacturers had already spent precious time and significant financial
9  resources to develop and promote their PIs around Norvir, while in the
10 meantime foregoing the alternative approaches, and even waited until after the
11 new PI drugs had been approved by the FDA, labeled and marketed for use
12 with boosting by Norvir, before instituting this staggering price increase. Not
13 until it had a captive audience did Abbott seek to abuse its now entrenched
14 dominant position. This increase in price without a loss of market share is the
15 hallmark of monopoly power, which power Abbott clearly did not have prior to
16 the fruition of its deceptive scheme. In other words, the price increase would
17 not have been profitably sustainable unless and until Abbott's competitors in
18 the boosted PI market were locked in to using Norvir.

19     22.    As reported in the *Wall Street Journal*, internal Abbott
20 documents reveal, among other things, that: (a) Abbott understood the illegal
21 nature of the price-increase scheme and contemplated other strategies, like
22 ceasing sales of Norvir, to "minimize any federal investigations regarding
23 price increases in the US"; (b) Abbott understood the adverse consequences of
24 the scheme, including that it would "tarnish" the reputation of Abbott's CEO,
25 "[p]osition [Abbott] as [a] big, bad, greedy pharmaceutical company,"
26 "[f]uel[]perception[s] regarding lack of Abbott commitment to HIV," and
27 create a "[b]acklash from [the] advocacy community, legislators, [and]
28 physicians"; and (c) Abbott floated pretextual rationales for the price increase

1   but worried about its "[e]xposure on price if forced to open [its] books."

2       23.    Additionally, Abbott's scheme regarding Norvir was extended to

3   the market for boosted PIs. Faced with the prospect of new competitors to

4   Abbott's boosted PI, Kaletra—*i.e.*, at least two new PIs from GSK (Lexiva)

5   and BMS (Reyataz) —Abbott's executive forsook legal approaches to

6   defending against a loss of market share. Instead, its executives executed an

7   anticompetitive scheme to parlay Abbott's domination of the boosting market

8   into leverage to maintain or increase Kaletra's dominant market position in the

9   boosted PI market. Abbott executives realized that if Abbott could make

10  Norvir unavailable or less desirable when paired with its competitors' PIs—by

11  actually pulling it from the market or by manipulating its price—then its

12  competitors' products, which by that time almost always relied on Norvir for

13  boosting, would never become a significant competitive threat to Kaletra's

14  market dominance.

15      24.    According to internal Abbott emails and other documents

16  released by the *Wall Street Journal*, one Abbott executive explained Abbott's

17  concern in the following manner: Abbott could not "continue to trade a

18  prescription of Kaletra for a prescription of Norvir at 100 mg." Rather than

19  rely on any competitive advantage in the medicinal characteristics of Kaletra,

20  or even on lowering Kaletra's price so that it was more attractive to patients,

21  this executive outlined alternative anticompetitive plans that had been

22  discussed among Abbott management and warned other senior Abbott

23  employees not to be "stunned by the outcome of the thought process."

24      *25.*    But the emails *are* stunning. One scenario that Abbott

25  considered was to withdraw Norvir capsules from the market entirely, leaving

26  HIV patients only with a liquid form of Norvir that Abbott's own executives

27  admit "taste[s] like someone else's vomit." Other materials reveal that Abbott

28  planned to make up a justification for this withdrawal. Executives considered

Class Action Complaint                                                    10

1 | misleading the public into believing that Abbott was diverting the capsules for
2 | humanitarian efforts in "the developing world (i.e. Africa)." *Thus, Abbott*
3 | *consciously explored limiting Norvir's availability despite the fact that it had*
4 | *induced its competitors to develop their drugs for use with Norvir.*

5 | 26.    Once it realized that it could not physically reduce Norvir's
6 | presence in the market, Abbott decided on a different strategy in which it
7 | would use its artificially maintained monopoly power in the booster market to
8 | raise Norvir's prices to irrational, punitive levels, which would artificially
9 | decrease demand for competing PIs that were developed for use with Norvir.
10 | *Significantly, Abbott's ability to raise Norvir's prices by 400% was due to –*
11 | *and a clear reflection of – the monopoly power in the booster market that*
12 | *Abbott had improperly obtained/maintained by inducing its competitors to not*
13 | *develop competing boosters or develop their PIs for use with other non-*
14 | *booster chemicals that could be an alternative to Norvir.*

15 | 27.    In both scenarios, Abbott suggested leaving the price of Kaletra
16 | unchanged, thus giving Abbott a huge price advantage for PIs boosted by
17 | Norvir. They outlined a "rationale" for the proposed Norvir price increase,
18 | suggesting that Abbott mislead the public into believing that "it is no longer
19 | feasible for Abbott to provide a production line of Norvir capsules at the
20 | current price." The emails, however, frankly admit the "weakness" of this
21 | "rationale" – i.e., its falsity. They frankly expressed concerns of "exposure on
22 | price if forced to open books."

23 | 28.    An Abbott slide presentation created around the time of these
24 | emails further illustrates the anticompetitive and illegitimate motives behind
25 | Abbott's price hike. The presentation reveals, for example, that Abbott sought
26 | to "[p]osition Kaletra as a more economical option for boosted ARV *[anti-*
27 | *retroviral]* therapy." Abbott acknowledged the illegitimacy of its plan, but
28 | still Abbott found it easier to mislead the public regarding an anticompetitive

Class Action Complaint                                                          11

1  price increase than to try to explain a complete withdrawal of Norvir capsules
2  from the market.

3      29.    On information and belief, internal Abbott documents state
4  Abbott's intentions: the huge price increase for Norvir would create not only
5  extreme monopoly profits for Norvir, but also the "[p]otential for increased
6  market share for Kaletra." Abbott's December 3, 2003 price increase was an
7  attempt to leverage its monopoly position in the boosting market in order to
8  disadvantage competitors and maintain its dominant position in the boosted PI
9  market. The attempt succeeded.

10     30.    Abbott's leveraging scheme effectively halted the decline in
11 market share of Kaletra. By 2006, Kaletra's share of the boosted PI market
12 had risen to approximately 75%, the same share it held prior to the introduction
13 of Reyataz. This change of course was due entirely to the competitive
14 disadvantage imposed on non-Abbott PIs by the December 2003 price
15 increase.

16                        **RELEVANT MARKETS**

17     31.    There are two product markets relevant to Plaintiffs' antitrust
18 claims. The Boosting Market currently consists of Norvir alone because
19 Abbott's conduct fraudulently induced and dissuaded competitors from
20 developing new competing boosters and/or developing their PIs for use with
21 other chemicals, which are not technically labeled as boosters but which could
22 be used as an alternative to Norvir to increase the efficacy of the competing
23 PIs. The Boosted PI Market consists of the PI Kaletra and a number of non-
24 Abbott PIs, each of which is prescribed, dispensed and used in conjunction
25 with Norvir. The relevant geographic market for both products is the United
26 States.

27     32.    At all relevant times, Abbott has had a dominant share of the
28 Boosting Market and a dominant share of the Boosted PI market. At all

Class Action Complaint                                              12

1  relevant times, Abbott possessed monopoly power—the ability to profitably
2  raise price significantly above competitive level without losing significant
3  sales—in both relevant markets.

4      33.    There are substantial barriers to entry in both the market for
5  boosters and the market for boosted PIs. The products in these markets can
6  require hundreds of millions of dollars and many years to design, develop, and
7  distribute.    Compounding these barriers to entry, both markets require
8  government approvals to enter and are covered by patents and other forms of
9  intellectual property. Thus, competitors or potential market entrants lack the
10 capacity to increase output in the short run.

11     34.    The unlawful actions alleged above were taken for the purpose
12 of maintaining Abbott's dominant share of both the Boosting Market and the
13 Boosted PI Market.

14     35.    At all relevant times, Abbott possessed substantial market power
15 and monopoly power with respect to Norvir, because, *inter alia*, Abbott (a) had
16 the power to control prices and exclude competition in the Boosting market;
17 (b) sold Norvir at prices substantially in excess of marginal cost; (c) enjoyed
18 high profit margins on sales of Norvir; (d) sold Norvir at prices substantially in
19 excess of the competitive price; (e) enjoyed substantial barriers to market entry
20 and growth; and (f) would not, by raising the price of Norvir a small but
21 significant nontransitory amount, lose sufficient sales to other products to
22 make such a price increase unprofitable.    This monopoly power was
23 improperly maintained by the exclusion of other competing substitutes for
24 Norvir, as alleged herein

25     36.    At all relevant times, Abbott possessed substantial market power
26 and monopoly power with respect to Kaletra, because, *inter alia*, Abbott (a)
27 had the power to control prices and exclude competition in the Boosted PI
28 Market because of its ability to control the price of Norvir, a necessary input in

Class Action Complaint                                                    13

1  the Boosted PI Market; (b) sold Kaletra at prices substantially in excess of
2  marginal cost; (c) enjoyed high profit margins on sales of Kaletra; (d) sold
3  Kaletra at prices substantially in excess of the competitive price; (e) enjoyed
4  substantial barriers to market entry and growth; and (f) would not, by raising
5  the price of Kaletra a small but significant nontransitory amount, lose
6  sufficient sales to other products to make such a price increase unprofitable.

7

8  ## ALLEGATIONS OF HARM TO THE PLAINTIFF CLASS

9      37.    As a direct and proximate result of Abbott's unlawful conduct,
10  LWD and the Class have been injured in their business and property by reason
11  of Abbott's unlawful maintenance of its monopoly power in the Booster
12  Market. Plaintiffs' injury consists of paying improperly, artificially-inflated,
13  supra-competitive prices for Norvir (ritonavir) which they otherwise would not
14  have paid absent Abbott's illegal conduct. Plaintiffs' injury is injury of the type
15  the antitrust laws were designed to prevent and flows from that which makes
16  Abbott's conduct unlawful.

17      38.    Abbott's exclusionary conduct has unlawfully caused the
18  Boosted PI Market to standardize on Norvir for boosting purposes and has
19  significantly retarded the advent of alternatives to Norvir in the United States,
20  thereby enabling Abbott to sell Norvir at artificially inflated prices. But for
21  Abbott's illegal conduct, multiple other avenues for providing, or obviating the
22  need for, boosting functionality would have been invested in, pursued,
23  resulting in a much lower demand, and therefore profitably sustainable price,
24  for Norvir.

25      39.    As a direct and proximate result of Abbott's unlawful conduct,
26  LWD and the Class have been injured in their business and property by reason
27  of Abbott's unlawful monopolization of the Boosted PI Market.  Abbott's
28  exclusionary conduct has unlawfully and artificially inflated the cost of

Class Action Complaint                                                    14

1  competing products in the Boosted PI Market (such as Lexiva and Reyataz),
2  thereby allowing Abbott to sell Kaletra at artificially inflated prices. But for
3  Abbott's illegal conduct, the effectiveness of competing products in the
4  Boosted PI Market would not have been dependent to the accompanying use of
5  a dramatically overpriced component, Norvir, and thus competing PIs would
6  have been far more attractive to patients, increasing the demand and sales for
7  those products. This, in turn, would have forced Abbott to significantly reduce
8  Kaletra's price. Plaintiffs' injury is injury of the type the antitrust laws were
9  designed to prevent and flows form that which makes Abbott's conduct
10 unlawful.

11     40.    Moreover, as a direct and proximate result of Abbott's unlawful
12 conduct, consumers—for example, patients living with HIV/AIDS and the
13 health care professionals who treat them—have been deprived of the benefit of
14 free and open competition in the boosted PI market and have been injured in
15 their business and property, for example, by:

16          a.  paying more for boosted PI treatments than they would have
17              in the
18              absence of Abbott's unlawful conduct;
19          b.  being denied the benefit of a broader variety of boosted PI
20              treatments; and
21          c.  being denied the benefit of research and development that
22              likely would have resulted in alternative and superior forms
23              of PI treatments.

24                      **CLASS ACTION ALLEGATIONS**

25     41.    Plaintiff brings this action on its own behalf and under Fed. R.
26 Civ. P. 23(b)(2), with respect to declaratory and equitable relief sought herein,
27 and under Fed. R. Civ. P. 23(b)(3), with respect to damages sought herein, as
28 representative of a class (the "Class") defined as follows:

Class Action Complaint                                              15

1
2
3
4
5
6
7
8
9

> All persons or entities in the United States that purchased Norvir or Kaletra directly from Abbott or any of its divisions, subsidiaries, predecessors, or affiliates, during the period from December 3, 2003 through such time as the effects of Abbott's illegal conduct have ceased, and excluding federal governmental entities, Abbott, and Abbott's divisions, subsidiaries, predecessors, and affiliates.

10  42.    Hundreds of entities in the United States have purchased Norvir
11 and/or Kaletra directly from Abbott.  Thus, members of the Class are so
12 numerous that joinder is impracticable.

13  43.    Plaintiff's claims are typical of the Class.

14  44.    Plaintiff and all members of the Class were damaged by the same
15 conduct of the Defendant.

16  45.    Plaintiff will fairly and adequately protect and represent the
17 interests of the Class. The interests of the Plaintiff are not antagonistic to the
18 Class.

19  46.    Plaintiff is represented by counsel who are experienced and
20 competent in the prosecution of complex class action antitrust litigation.

21  47.    Questions of law and fact common to the members of the Class
22 predominate over questions, if any, that may affect only individual members
23 because Defendant has acted and refused to act on grounds generally
24 applicable to the entire Class.  Such generally applicable conduct is inherent in
25 the Defendant's exclusionary and anticompetitive conduct in monopolizing
26 and attempting to monopolize the boosted PI market and booster PI market, as
27 more fully alleged herein.

28  48.    Questions of law and fact common to the Class include:

Class Action Complaint                                          16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a.  Whether Abbott intentionally and unlawfully excluded competitors from the Boosting Market;

b.  Whether Abbott unlawfully attempted to monopolize the Boosting Market during the Class Period;

c.  Whether Abbott intentionally and unlawfully excluded competitors from the Boosted PI Market;

d.  Whether Abbott unlawfully attempted to monopolize the Boosted PI Market during the Class Period;

e.  Whether Abbott engaged in anticompetitive conduct in order to monopolize the Boosting Market by wrongfully inducing rivals in the PI market to forgo developing and/or testing boosting alternatives.

f.  Whether Abbott engaged in anticompetitive conduct in order to leverage its monopoly in the Boosting Market to obtain, maintain, or extend an undue monopoly in the Boosted PI Market;

g.  Whether the geographic market for both protease inhibitor boosters and boosted protease inhibitors is the United States;

h.  Whether the product market in which Abbott obtained a monopoly is the Boosting Market;

i.  Whether the product market Abbott was attempting to monopolize is the Boosted PI Market;

j.  Whether Abbott intended to monopolize the Boosting Market or to maintain or extend an existing monopoly on the Boosting Market;

k.  Whether Abbott intended to monopolize the Boosted PI Market or to maintain or extend an existing monopoly on the Boosted PI Market;

Class Action Complaint                                                    17

1      l.  Whether there was and is a dangerous probability that

2           Abbott would succeed in monopolizing the Boosting Market;

3     m.  Whether there was and is a dangerous probability that

4           Abbott would succeed in monopolizing the Boosted PI

5           Market;

6     n.  Whether Abbott had pro-competitive reasons for its conduct;

7     o.  The effects of Abbott's attempted monopolization;

8     p.  The effects of Abbott's attempted monopolization on prices

9           of boosted protease inhibitors; and

10    q.  Whether Plaintiff and other members of the Class have been

11           damaged as a result of Defendant's unlawful behavior and

12           what is the proper measure of damages.

13     49.    Class action treatment is a superior method for the fair and

14 efficient adjudication of the controversy, in that, among other things, such

15 treatment will permit a large number of similarly situated persons to prosecute

16 their common claims in a single forum simultaneously, efficiently, and without

17 the unnecessary duplication of effort and expense that numerous individual

18 actions would engender.  The benefits of proceeding through the class

19 mechanism, including providing injured persons or entities with a method for

20 obtaining redress for claims that might not be practicable for them to pursue

21 individually, substantially outweigh any difficulties that may arise in

22 management of this class action.

23     50.    Plaintiff knows of no difficulty to be encountered in the

24 maintenance of this action as a class action.

25                  **FIRST CAUSE OF ACTION**

26              **Monopolization (15 U.S.C. § 2)**

27     51.    Plaintiff incorporates by reference the allegations contained in

28 paragraphs 1 through 49 above.

Class Action Complaint                                                   18

52.    At all relevant times, Abbott has had monopoly power in both the Boosting Market and the Boosted PI Market.

53.    Abbott has willfully maintained its monopoly power in the Boosting Market through exclusionary and anticompetitive means. As described in more detail above, Abbott deceptively caused the Boosted PI Market to forego other developmental alternatives and instead standardize around the use of Norvir for boosting purposes. Once competitors were locked in to using Norvir, Abbott exercised its monopoly power in the Boosting Market by raising the price of Norvir approximately 400% in December 2003. Abbott has maintained that price to the present day. The purpose and effect of Abbott's conduct has been to suppress rather than promote competition on the merits.

54.    There is no procompetitive justification for Abbott's conduct.

55.    Plaintiff has been injured in its business and property by reason of Abbott's unlawful monopolization.  Plaintiff's injury consists of paying higher prices to purchase the relevant products than they would have paid absent Abbott's conduct.  This injury to Plaintiff's business and property is injury of the type the antitrust laws were designed to prevent and flows from that which makes Abbott's conduct unlawful.

56.    Abbott's unlawful conduct threatens continuing loss and damage to Plaintiff and the Class if not enjoined by this Court.

## SECOND CAUSE OF ACTION

## Monopolization (15 U.S.C. § 2)

57.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 49 above.

58.    At all relevant times, Abbott has had monopoly power in both the Boosting Market and the Boosted PI Market.

59.    Abbott has willfully maintained its monopoly power in the

1  Boosted PI Market through exclusionary and anticompetitive means. As
2  described in more detail above, Abbott raised the price of Norvir by
3  approximately 400% in December 2003, and has maintained that price to the
4  present day, but only when Norvir is used to boost a non-Abbott PI. Norvir is
5  sold at a much lower price when used as one component of Abbott's own
6  boosted PI, Kaletra. By instituting such a price increase, Abbott has used its
7  monopoly position in the Boosting Market to gain an artificial competitive
8  advantage and unfairly disadvantage its competitors in the Boosted PI Market.
9  The purpose and effect of Abbott's conduct has been to suppress rather than
10 promote competition on the merits.

11        60.    There is no procompetitive justification for Abbott's conduct.

12        61.    Plaintiff has been injured in its business and property by reason
13 of Abbott's unlawful monopolization. Plaintiff's injury consists of paying
14 higher prices to purchase the relevant products than they would have paid
15 absent Abbott's conduct. This injury to Plaintiff's business and property is
16 injury of the type the antitrust laws were designed to prevent and flows from
17 that which makes Abbott's conduct unlawful.

18        62.    Abbott's unlawful conduct threatens continuing loss and damage
19 to Plaintiff and the Class if not enjoined by this Court.

20                    **THIRD CAUSE OF ACTION**
21              **Attempt to Monopolize (15 U.S.C. § 2)**

22        63.    Plaintiff incorporates by reference the allegations contained in
23 paragraphs 1 through 45 above.

24        64.    At all relevant times, Abbott has had monopoly power in the
25 Boosting Market and a dangerous probability of achieving monopoly power in
26 the Boosted PI Market.

27        65.    Abbott has attempted to monopolize the Boosted PI Market
28 through exclusionary and anticompetitive means. As described above, Abbott

Class Action Complaint                                              20

1   raised the price of Norvir by 400% in December 2003, and has maintained that
2   price to the present day, but only when Norvir is used to boost a non-Abbott
3   PI.  Norvir is sold at a much lower price when used as one component of
4   Abbott's own boosted PI, Kaletra. By instituting such a price increase, Abbott
5   has used its monopoly position in the Boosting Market to gain an artificial
6   competitive advantage and unfairly disadvantage its competitors in the
7   Boosted PI Market.  The purpose and effect of Abbott's conduct has been to
8   suppress rather than promote competition on the merits.

9       66.    At all relevant times, Abbott has had the specific intent to
10  monopolize the Boosted PI Market.

11      67.    There is no procompetitive justification for Abbott's conduct.

12      68.    Plaintiff has been injured in its business and property by reason
13  of Abbott's unlawful attempted monopolization.  Plaintiff's injury consists of
14  paying higher prices to purchase the relevant products than they would have
15  paid absent Abbott's conduct.  This injury to Plaintiff's business and property
16  is injury of the type the antitrust laws were designed to prevent and flows from
17  that which makes Abbott's conduct unlawful.

18      69.    Abbott's unlawful conduct threatens continuing loss and damage
19  to Plaintiff and the Class if not enjoined by this Court.

20

21                  ***PRAYER FOR RELIEF***

22      WHEREFORE, Plaintiff prays that:

23          (a)    The Court determine that this action may be maintained as
24  a class action pursuant to Fed. R. Civ. P. 23;

25          (b)    The conduct alleged herein be declared, adjudged and/or
26  decreed to be unlawful under Section 2 of the Sherman Act;

27          (c)    Plaintiff and the Class recover their overcharge damages,
28  trebled, and the costs of the suit, including reasonable attorneys' fees as

provided by law; and

      (d)    Plaintiff and the Class be granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

1
2

**<u>JURY TRIAL DEMAND</u>**

3    Plaintiff demands a trial by jury for all issues so triable.

4

5    Dated December ___3___, 2007

6
7
8
9
10
11
12

By its attorneys,

Charles M. Kagay
SPIEGEL, LIAO & KAGAY
388 Market Street, Suite 900
San Francisco, CA  94111
Tel: (415) 956-5959
Fax: (415) 362-1431

Attorneys for Plaintiff

13    Additional counsel for whom *pro hac vice*
14    admission will be sought:

15    GARWIN GERSTEIN & FISHER, LLP
16    Bruce E. Gerstein
      Noah H. Silverman
17    1501 Broadway, Suite 1416
18    New York, New York 10036
      Tel: (212) 398-0055
19    Fax: (212) 764-6620

20    ODOM & DES ROCHES, LLP
21    John Gregory Odom
      Stuart E. Des Roches
22    John Alden Meade
23    Suite 2020, Poydras Center
      650 Poydras Street
24    New Orleans, LA 70130
25    Tel: (504) 522-0077
      Fax: (504) 522-0078
26
27
28

Class Action Complaint                                                          23

1 | PERCY SMITH & FOOTE, LLP
2 | David P. Smith
  | W. Ross Foote
3 | 720 Murray Street
4 | P.O. Box 1632
  | Alexandria, LA 71309
5 | Tel: (318) 445-4480
6 | Fax: (318) 487-1741
7 | KOZYAK TROPIN & THROCKMORTON, P.A.
8 | Tucker Ronzetti
  | Adam Moskowitz
9 | 2800 Wachovia Financial Center
10 | 200 South Biscayne Boulevard
   | Miami, Florida 33131-2335
11 | Telephone: (305) 372-1800
12 | Telecopier: (305) 372-3508