1  Joseph R. Saveri (SBN 130064)
   *jsaveri@lchb.com*
2  Eric B. Fastiff (SBN 182260)
   *efastiff@lchb.com*
3  Brendan Glackin (SBN 199643)
   *bglackin@lchb.com*
4  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   Embarcadero Center West
5  275 Battery Street, 30th Floor
   San Francisco, CA  94111-3339
6  Telephone:  (415) 956-1000
   Facsimile:  (415) 956-1008

7  *Attorneys for Plaintiffs*
   *Rochester Drug Co-Operative, Inc. and*
8  *Meijer, Inc., and Meijer Distribution, Inc.*

9  Charles M. Kagay (SBN 073377)
   *cmk@slksf.com*
10 SPIEGEL, LIAO & KAGAY
   388 Market Street, Suite 900
11 San Francisco, CA 94111
   Telephone:  (415) 956-5959
12 Facsimile:  (415) 362-1431

13 *Attorneys for Plaintiff Louisiana Wholesale Drug Company,*
   *Inc.*
14
   [Additional Attorneys listed on Signature Page]
15
                   UNITED STATES DISTRICT COURT
16
                  NORTHERN DISTRICT OF CALIFORNIA
17
                        (OAKLAND DIVISION)
18

19
20 MEIJER, INC. & MEIJER             Case No. C 07-5985 CW
   DISTRIBUTION, INC., on behalf of
21 themselves and all others similarly   **DIRECT PURCHASER CLASS PLAINTIFFS'**
   situated,                          **NOTICE OF MOTION AND MOTION FOR**
22                                     **CLASS CERTIFICATION**
                  Plaintiffs,
23                                     Date:    August 7, 2008
   v.                                  Time:    2:00 p.m.
24                                     Place:   Courtroom 2, 4th Floor
   ABBOTT LABORATORIES,                Judge:   Hon. Claudia Wilken
25
                  Defendant.
26
27 --[*caption continues next page*]--   **REDACTED VERSION**

28
761383.1

| | |
|---|---|
| 1 | ROCHESTER DRUG CO-OPERATIVE, INC., on behalf of itself and all others similarly situated, |
| 2 | |
| 3 | Plaintiff, |
| 4 | v. |
| 5 | ABBOTT LABORATORIES, |
| 6 | Defendant. |

Case No. C 07-6010 CW

**Hon. Claudia Wilken**

| | |
|---|---|
| 7 | |
| 8 | LOUISIANA WHOLESALE DRUG COMPANY, INC., on behalf of itself and all others similarly situated, |
| 9 | |
| 10 | Plaintiff, |
| 11 | v. |
| 12 | ABBOTT LABORATORIES, |
| 13 | Defendant. |

Case No. C 07-6118 CW

**Hon. Claudia Wilken**

14

15

16

17 <u>**REDACTED VERSION**</u>

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR CLASS CERTIFICATION

761383.1

1    <u>**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**</u>

2    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3    PLEASE TAKE NOTICE that on August 7, 2008 at 2:00 p.m. in Courtroom 2, 4th floor,

4    San Francisco, California before the Honorable Claudia Wilken, Meijer, Inc., Meijer Distribution,

5    Inc., Rochester Drug Co-operative, Inc., and Louisiana Wholesale Drug Co., Inc. (collectively,

6    "Direct Purchaser Class Plaintiffs"), hereby move pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for

7    the certification of the following Plaintiff Class:

8
> All persons or entities in the United States that purchased Norvir
> and/or Kaletra directly from Abbott or any of its divisions,
9    > subsidiaries, predecessors, or affiliates during the period from
> December 3, 2003 through such time as the effects of Abbott's
10   > illegal conduct ceased, and excluding governmental entities,
> Abbott, and Abbott's divisions, subsidiaries, predecessors and
11   > affiliates.

12   In support of this motion, the Direct Purchaser Class Plaintiffs aver that:

13   1.    The members of the Class are so numerous and geographically dispersed that

14   joinder of all members is impractical as required by Fed. R. Civ. P. 23(a)(1).

15   2.    There are questions of law and fact common to the Class, as required by Fed. R.

16   Civ. P. 23(a)(2), including:

17   a.    whether Abbott intentionally and unlawfully impaired or impeded

18   competitors in the boosting and/or boosted markets;

19   b.    whether Abbott unlawfully attempted to monopolize the boosted market;

20   c.    whether Abbott engaged in anticompetitive conduct in order to leverage its

21   monopoly in the boosting market to impair rivals in the boosted market;

22   d.    whether the geographic market for both boosting drugs and boosted drugs

23   is the United States;

24   e.    whether Abbott has monopoly power in a relevant market defined as the

25   boosting market;

26   f.    whether Abbott intended to impair rivals in the boosted market or to

27   monopolize the boosted market or to maintain or extend an existing monopoly on the boosted

28   market, and in fact maintain or extended monopoly power in the boosted market;

i

1    g. whether there was and is a dangerous probability that Abbott would

2 succeed in impairing rivals in the boosted market and/or in monopolizing the boosted market;

3    h. whether Abbott had pro-competitive reasons for its conduct;

4    i. the effects of Abbott's attempted monopolization on prices of boosted

5 drugs;

6    j. whether Plaintiffs and other members of the Class have been damaged by

7 paying more for the relevant drugs as a result of Abbott's unlawful behavior; and

8    k. the proper measure of damages.

9   3. The Direct Purchaser Class Plaintiffs will fairly and adequately protect the

10 interests of the members of the Class, as required by Fed. R. Civ. P. 23(a)(4). The Direct

11 Purchaser Class Plaintiffs' claims are typical of those of the Class they seek to represent. The

12 Direct Purchaser Class Plaintiffs' interests are coincident with and not antagonistic to those of

13 other members of the Class.

14   4. The questions of law and fact common to members of the Class, identified in

15 paragraph 2 above, predominate over any questions affecting only individual members, including

16 legal and factual issues relating to liability and damages.

17   5. A class action is superior to other available methods for the fair and efficient

18 adjudication of this controversy. The members of the Class are readily definable, and they can be

19 identified from records that exist in the files of defendant. Prosecution as a class action will

20 eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large

21 number of similarly situated persons to adjudicate their common claims in a single forum

22 simultaneously, efficiently and without the duplication of effort or expense that numerous

23 individual actions would engender. Class treatment will also permit the adjudication of relatively

24 small claims by many class members who otherwise could not afford to litigate an antitrust claim

25 such as is asserted in the Complaint. This action presents no difficulties of management that

26 would preclude its maintenance as a class action.

27

28

ii

1       In support of this Motion, the Direct Purchaser Class Plaintiffs also rely upon the

2  accompanying Memorandum of Points and Authorities, supporting exhibits, and Declaration of

3  economist Hal Singer, Ph.D.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

761383.1

**TABLE OF CONTENTS**
(continued)

Page

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................. 3

    A.      Plaintiffs' Allegations ................................................................................ 3

    B.      Cascade ...................................................................................................... 6

    C.      Summary of Expert Declaration of Hal Singer, Ph.D. ............................... 7

III.    ARGUMENT ........................................................................................................ 8

    A.      Class Certification is Particularly Appropriate in Antitrust Cases ............ 8

    B.      The Standard for Class Certification Under Rule 23 ................................. 9

    C.      The Requirements of Rule 23(a) Are Satisfied ......................................... 9

        1.      Numerosity ................................................................................... 9

        2.      Multiple Common Questions of Law and Fact Are Present ......... 10

        3.      Class Representatives' Claims Are Typical of the Claims of the Class ................................................................................. 12

        4.      The Class Representatives Will Fairly and Adequately Protect the Interests of the Class .................................................... 13

            a.      Absence of Conflict ........................................................ 13

            b.      Qualifications of Proposed Class Counsel ...................... 14

    C.      The Requirements of Rule 23(b)(3) Are Satisfied ................................... 14

        1.      Predominance ............................................................................... 14

            a.      Violation of the Antitrust Laws ...................................... 16

            b.      Antitrust Injury ............................................................... 17

            c.      Damages .......................................................................... 21

        2.      Superiority ................................................................................... 24

IV.     CONCLUSION .................................................................................................... 25

761383.1

1

## TABLE OF AUTHORITIES

2
Page

3    <u>CASES</u>

4    *In re Abbott Labs. Norvir Antitrust Litig.*,
        442 F. Supp. 2d 800 (N.D. Cal. 2006) ....................................................... 15
5
     *In re Abbott Labs. Norvir Antitrust Litig.*,
6       2007 U.S. Dist. LEXIS 44459 (N.D. Cal. Jun. 11, 2007) ..................................... *passim*

7    *Amchem Prods., Inc. v. Windsor*,
        521 U.S. 591 (1997) ..................................................................................... 15
8
     *In re Ampicillin Antitrust Litig.*,
9       55 F.R.D. 269 (D.D.C. 1972) ....................................................................... 9

10   *In re Beer Distrib. Antitrust Litig.*,
        188 F.R.D. 549 (N.D. Cal. 1998) ................................................................ 13
11
     *Blackie v. Barrack*,
12      524 F.2d 891 (9th Cir. 1975) ....................................................................... 22

13   *Blanton v. Mobil Oil Corp.*,
        721 F.2d 1207 (9th Cir. 1983) ..................................................................... 21
14
     *Bogosian v. Gulf Oil Corp.*,
15      561 F.2d 434 (3d Cir. 1977) ......................................................................... 19

16   *In re Buspirone Patent & Antitrust Litig.*,
        210 F.R.D. 43 (S.D.N.Y. 2002) ................................................ 2, 9, 10, 11, 14, 16, 21
17
     *Californians for Disability Rights, Inc. v. California Dep't of Transp.*,
18      2008 U.S. Dist. LEXIS 19766 (N.D. Cal. Mar. 13, 2008) ............................. 10

19   *In re Carbon Black Antitrust Litig.*,
        2005 U.S. Dist. LEXIS 660 (D. Mass. Jan. 18, 2005) .............................. 19
20
     *In re Cardizem CD Antitrust Litig.*,
21      200 F.R.D. 297 (E.D. Mich. 2001) .................... 2, 10, 12, 14, 18, 21, 22, 25

22   *Cascade Health Solutions v. PeaceHealth*,
        515 F.3d 883 (9th Cir. 2008) ............................... 6, 7, 16, 20, 22, 23
23
     *Christiana Mortgage Corp. v. Delaware Mortgage Bankers Ass'n*,
24      136 F.R.D. 372 (D. Del. 1991) ..................................................................... 16

25   *In re Citric Acid Antitrust Litig.*,
        1996 WL 655791 (N.D. Cal. Oct. 2, 1996) ...................................... 8, 9, 12
26
     *In re Domestic Air Transp. Antitrust Litig.*,
27      137 F.R.D. 677 (N.D. Ga. 1991) ................................................................ 25

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Du Pont Glore Forgan, Inc. v. American Tel. & Tel. Co.,*
  69 F.R.D. 481 (S.D.N.Y. 1975) ................................................................ 9

4

*In re Dynamic Random Access Memory Antitrust Litig.,*
  2006 WL 1530166 (N.D. Cal. Jun. 5, 2006) ....................................... *passim*

5

6

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) .......................................................... 11, 13, 15

7

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ............................................................... 12

8

9

*Hawaii v. Standard Oil Co. of Cal.,*
  405 U.S. 251 (1972) ........................................................................ 8

10

*Illinois Brick Co. v. Illinois,*
  431 U.S. 720 (1977) ...................................................................... 21

11

12

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997) ............................................................ 15

13

*Image Tech. Servs. v. Eastman Kodak Co.,*
  1994 U.S. Dist. LEXIS 12652 (N.D. Cal. Sept. 2, 1994) ........................... 9

14

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.,*
  225 F.R.D. 208 (S.D. Ohio 2003) ..................... 2, 9, 11, 12, 16, 17, 18, 21, 25

15

16

*Jennings Oil Co v. Mobil Oil Corp.,*
  80 F.R.D. 124 (S.D.N.Y. 1978) .............................................. 1, 9, 11, 16

17

18

*Jensen Enters., Inc. v. Oldcastle, Inc.,*
  2006 U.S. Dist. LEXIS 68262 (N.D. Cal. Sept. 7, 2006) .......................... 15

19

*In re K-Dur Antitrust Litig.,*
  No. 01-1652 (D.N.J. Apr. 14, 2008) ................................. 2, 10, 14, 15, 18, 21

20

21

*In re Linerboard Antitrust Litig.,*
  305 F.3d 145 (3d Cir. 2002) ................................................................ 18

22

*Little Caesar Enters. v. Smith,*
  172 F.R.D. 236 (E.D. Mich. 1997) ...................................................... 22

23

24

*In re Live Concert Antitrust Litig.,*
  247 F.R.D. 98 (C.D. Cal. 2007) .......................................... 8, 13, 16, 17, 18, 21, 22

25

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,*
  244 F.3d 1152 (9th Cir. 2001) .............................................................. 13

26

27

*In re Lorazepam & Clorazepate Antitrust Litig.,*
  202 F.R.D. 12 (D.D.C. 2001) ............................................................ 2, 9, 21

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis,*
      No. 07-7343  (S.D.N.Y. April 10, 2008) ........................................................ 2

4

5    *Meijer, Inc., et al. v. Abbott Laboratories,*
      2008 U.S. Dist. LEXIS 31816 (N.D. Cal. Apr. 11, 2008) ............................. 6

6    *Meijer, Inc, v. Warner Chilcott Holdings Co. III, Ltd.,*
      246 F.R.D. 293 (D.D.C. 2007) ........................................... 2, 10, 14, 21

7

8    *Morelock Enters., Inc. v. Weyerhaeuser Co.,*
      2004 U.S. Dist. LEXIS 28270 (D. Ore. Dec. 16, 2006) ........................... 8, 17

9    *In re NASDAQ Market Makers Antitrust Litig.,*
      169 F.R.D. 493 (S.D.N.Y. 1996) ................................................... 20, 21

10

11   *In re Nifedipine Antitrust Litig.,*
      246 F.R.D. 365 (D.D.C. 2007) ...................................... 2, 10, 14, 19, 25

12   *In re Northwest Airlines Corp. Antitrust Litig.,*
      208 F.R.D. 174 (E.D. Mich. 2002) ........................................................ 18

13

14   *Paper Sys., Inc. v. Nippon Paper Indus., Co.,*
      281 F.3d 629 (7th Cir. 2002) ................................................................ 21

15   *In re Polypropylene Carpet Antitrust Litig.,*
      178 F.R.D. 603 (N.D. Ga. 1997) ........................................................... 18

16

17   *In re Potash Antitrust Litig.,*
      159 F.R.D. 682 (D. Minn. 1995) ........................................................... 24

18   *In re Relafen Antitrust Litig.,*
      218 F.R.D. 337 (D. Mass. 2003) ........................ 2, 9, 11, 12, 14, 16, 19

19

20   *Robertson v. National Basketball Ass'n,*
      389 F. Supp. 867 (S.D.N.Y. 1975) ......................................................... 9

21   *In re Rubber Chems. Antitrust Litig.,*
      232 F.R.D. 346 (N.D. Cal. 2005) ..................... 2, 8, 10, 13, 15, 18, 19, 21

22

23   *Sollenbarger v. Mountain States Tel. & Tel. Co.,*
      121 F.R.D. 417 (D.N.M. 1988) ............................................................. 25

24   *Stephenson v. Bell Atl. Corp.,*
      177 F.R.D. 279 (D.N.J. 1997) ................................................................ 9

25

26   *Thomas & Thomas Rodmakers, Inc., v. Newport Adhesives and Composites, Inc.,*
      209 F.R.D. 159 (C.D. Cal. 2002) ..................................................... 14, 15

27   *Town of New Castle v. Yonkers Contracting Co.,*
      131 F.R.D. 38 (S.D.N.Y. 1990) .............................................................. 8

28

- vii -                    CLASS ACTION COMPLAINT

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3      *Upshaw v. Ga. Catalog Sales, Inc.*,
       206 F.R.D. 694 (M.D. Ga. 2002) ............................................................. 25

4

5      *In re Vitamins Antitrust Litig.*,
       209 F.R.D. 251 (D.D.C. 2002)................................................................. 15

6      *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
       No. 04-5525 (E.D. Pa. May 2, 2008) ........................................................ 2

7

8      *Whiteway v. Fedex Kinko's Office & Print Servs., Inc.*,
       2006 WL 2642528 (N.D. Cal. Sept. 14, 2006) .................................. 9, 10, 15, 24, 25

9      *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*,
       668 F.2d 1014 (9th Cir. 1981)................................................................ 7

10

11    **STATUTES & OTHER AUTHORITY**

12    Fed. R. Civ. P. 23(a)....................................................... i, ii, 9, 10, 12, 13

13    Fed. R. Civ. P. 23(b)(3) ............................................................ i, 9, 14, 24

14    *Newberg on Class Actions* § 3.3 (4th ed. 2002)............................................ 10

15    Phillip E. Areeda & Herbert Hovenkamp, III ANTITRUST LAW ¶740d2 (rev. ed.
      2007) ................................................................................... 7

16    Phillip E. Areeda & Herbert Hovenkamp, III ANTITRUST LAW (2d ed. 2005) .................. 7

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

Plaintiffs Meijer, Inc., Meijer Distribution, Inc. ("Meijer"), Rochester Drug Co-operative,

4

Inc. ("RDC"), and Louisiana Wholesale Drug Co., Inc. ("LWD") (collectively, "Plaintiffs") are

5

direct purchasers (or assignees of direct purchasers) of Norvir and Kaletra from defendant Abbott

6

Laboratories ("Abbott"). Abbott manufactures Norvir, a protease inhibitor used to treat HIV by

7

boosting the therapeutic effects of other protease inhibitors. Abbott also produces Kaletra, a

8

combination drug consisting of the active ingredient in Norvir (ritonavir) and another Abbott

9

protease inhibitor with the chemical name lopinavir. Lopinavir is a PI that is boosted by

10

ritonavir. This case is about Abbott's abuse of its monopoly power to impair rivals and

11

artificially inflate prices to Plaintiffs and the class of direct purchasers defined as follows:

12

13          All persons or entities in the United States that purchased Norvir and/or
            Kaletra directly from Abbott or any of its divisions, subsidiaries,
14          predecessors, or affiliates during the period from December 3, 2003
            through such time as the effects of Abbott's illegal conduct ceased, and
15          excluding governmental entities, Abbott, and Abbott's divisions,
            subsidiaries, predecessors and affiliates (the "Direct Purchaser Class" or
16          "Class").

All of the central issues in this case brought under Section 2 of the Sherman Act will be

17

proven using predominantly, if not exclusively, common evidence, and each class member would

18

need to introduce precisely the same evidence to prove the elements of its case whether there

19

were several hundred separate trials, or one unified action. *E.g.*, *Jennings Oil Co v. Mobil Oil*

20

*Corp.*, 80 F.R.D. 124, 128 (S.D.N.Y. 1978) (proof of elements of monopolization claim is

21

"undoubtedly common to all the members of the . . . class"). Moreover, two additional factors

22

weigh strongly in favor of class certification here:

23

•  This Court has already certified a nationwide class of *indirect* purchasers of Norvir

24

relating to some of the same alleged anticompetitive conduct. *In re Abbott Labs. Norvir Antitrust*

25

*Litig.*, 2007 U.S. Dist. LEXIS 44459, at *23 (N.D. Cal. Jun. 11, 2007) (Wilken, J.) ("*Indirect*

26

*Case*"). Plaintiffs here are *direct* purchasers and therefore have standing to seek damages under

27

the federal antitrust laws, and are *not* seeking relief -- unlike the indirect purchaser class -- under

28

761383.1

1    the laws of numerous different states, and do not need to confront any issues relating to variations

2    in state laws or regarding the "pass on" of overcharges down the chain of distribution.[1]    This

3    motion thus presents an even easier case for class certification.  Indeed, the undersigned know of

4    no case in which an indirect class was certified, but a direct class was not (whereas the opposite is

5    all too often true).

6        • Numerous courts in analogous pharmaceutical antitrust cases have certified a nearly

7    identical direct purchaser class made up largely of pharmaceutical wholesalers, represented by

8    some of the same class representatives and the same core group of attorneys.  *E.g., J.B.D.L. Corp.*

9    *v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208 (S.D. Ohio 2003) (certifying class of direct

10   purchasers of prescription drug where plaintiffs alleged that defendant's exclusionary conduct

11   under Section 2 of the Sherman Act impeded the sale of a competing branded drug); *Meijer, Inc,*

12   *v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293 (D.D.C. 2007) (*"Ovcon"*) (certifying a

13   class of direct purchasers seeking overcharge damages as a result of defendants' agreement to

14   impede generic competition to a branded drug).[2]    Indeed, the arguments in favor of class

15   certification in antitrust cases involving overcharge damages for prescription drugs are so

16   compelling that defendants in a similar case (brought by one of the same named plaintiffs with

17   some of the same class counsel) recently agreed not to contest class certification in an effort to

18   streamline the litigation.  *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, No. 07-7343

19   _____

20   [1] *J.B.D.L.*, 225 F.R.D. at 216 (under settled law, "[a]ntitrust injury is considered complete when the direct
     purchaser pays an illegal overcharge and whether he [is] able to pass through the overcharge to indirect
     purchasers is irrelevant to the inquiry").

21   [2] *See also In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, No. 04-5525 (E.D. Pa. May 2, 2008); *In re
     K-Dur Antitrust Litig.*, No. 01-1652, Special Master's Report and Recommendation on the Direct

22   Purchaser Plaintiffs' Motion for Class Certification (D.N.J. Apr. 14, 2008) (certifying a class of direct
     purchasers seeking overcharge damages as a result of defendants' agreement to delay entry of a generic

23   equivalent) (attached as Exhibit A to Appendix of Unpublished Authority); *In re Nifedipine Antitrust
     Litig.*, 246 F.R.D. 365 (D.D.C. 2007) (certifying a class of direct purchasers of a generic drug seeking

24   overcharges stemming from an unlawful agreement to reduce competition among drug manufacturers); *In
     re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003) (certifying a class of direct purchasers seeking

25   overcharges for a violation of Section 2 due to defendants' wrongful filing of patent lawsuits to delay
     generic entry); *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43 (S.D.N.Y. 2002) (certifying class

26   of direct purchasers of prescription drug alleging overcharges as a result of delayed generic entry); *In re
     Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001) (certifying a class of direct purchasers

27   seeking overcharge damages as a result of defendants' agreement to delay entry of a generic equivalent).
     *See also In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 24-30 (D.D.C. 2001) (certifying

28   class in case involving monopolization claims by direct purchasers of drugs).

1    (S.D.N.Y. April 10, 2008) (attached as Exhibit B to Appendix of Unpublished Authority).

2    Moreover, in many of these prior cases, numerous class members have stepped forward to

3    express support for class certification and the numerous large class settlements totaling over $700

4    million combined.

5         As in the *Indirect Case*, all of the central issues in this case will be proven using

6    predominantly, if not exclusively, common evidence. And, just as in all monopolization cases

7    generally, the focus of this case will be on the nature of Abbott's unlawful conduct and whether

8    that conduct constitutes a violation of Section 2 of the Sherman Act. As demonstrated below, and

9    in the accompanying declaration of economist Hal Singer, Ph.D. ("Singer Decl."),[3] proof of

10   antitrust injury or fact of impact -- *i.e.*, showing that direct purchaser Class members paid

11   artificially inflated prices for Norvir and Kaletra -- will not vary from Class member to Class

12   member. As further discussed below, Dr. Singer also shows that while the amount of each Class

13   member's overcharges will obviously differ – as it does in nearly all antitrust cases – aggregate

14   overcharge damages to the class as a whole can be calculated using standard economic models

15   and other classwide evidence.

16   ## II.    FACTUAL BACKGROUND

17   ### A.    <u>Plaintiffs' Allegations</u>[4]

18        Plaintiffs allege a classic case of monopoly leveraging: using monopoly power in one

19   market to impair rivals and enhance market power in a separate market. Specifically, Plaintiffs

20   allege that by raising the price of Norvir (Abbott's boosting drug) by 400% in December 2003,

21   

22   Abbott leveraged its monopoly position in the market for boosting drugs (in which Abbott's

23   Norvir is the only product) to impair rivals and enhance its own market power in the boosted

24   market for protease inhibitors ("PIs").

25   

26   [3] Dr. Singer's Declaration is being filed under seal contemporaneously with this motion.

27   [4] Because the Court, by now, is familiar with the basic facts of this case, Plaintiffs will only briefly summarize some of the key factual elements of the claims here. Plaintiffs refer the Court to, *inter alia*, the factual summary in Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's

28   Motion to Dismiss, at 6-8, filed Feb. 14, 2008), for a more fulsome exposition of the pertinent facts.

1    Plaintiffs also allege that Abbott unlawfully maintained its monopoly power in the

2    boosting market by deliberately inducing potential competitors in the boosting market into relying

3    on Norvir as the de facto boosting agent, thereby impeding the development of potential rivals to

4    Norvir and/or delaying the development of technologies that would have permitted Norvir to be

5    used in substantially smaller amounts.

6

7    Plaintiffs allege that Abbott's anticompetitive scheme has resulted in the suppression of

8    competition in the boosted market and the boosting market and has caused Plaintiffs and other

9    direct purchasers to pay artificially inflated prices for Norvir and Kaletra.  As a direct result of

10   this illegal conduct, Abbott: (a) successfully shielded itself from price competition; and (b) has

11   been able to charge supra-competitive prices for Norvir and Kaletra to its direct customers

12   (Plaintiffs and proposed class members), bilking these customers and the public out of millions, if

13   not billions, of dollars.

14

15   In 1996, Abbott introduced Norvir, which was and still is a protease inhibitor (PI) drug

16   used to treat HIV. (Consolidated Amended Complaint ("CAC") ¶ 11.)  While introduced as a

17   stand-alone treatment, today HIV patients primarily use Norvir to enhance, or "boost," the effects

18   of other, complementary PIs.  (CAC ¶¶ 13-15.)  Norvir has no reasonable substitute for this

19   purpose; Abbott therefore enjoys a monopoly in the one-drug market for "boosting" PIs. (CAC

20   ¶¶ 17-18).

21

22   Abbott also markets Kaletra, a drug that combines the active ingredient in Norvir

23   (ritonavir) with a "boosted" PI (lopinavir). (CAC ¶ 16.)  Through mid-2003, Kaletra had captured

24   more than three quarters of the market for "boosted" PIs. (CAC ¶ 19.)  In 2002 and 2003,

25   however, Abbott became increasingly concerned that new, competitor boosted PI drugs, including

26   GlaxoSmithKline's Lexiva and Bristol-Myers Squibb's Reyataz – both of which need to be used

27   with boosting dose of Norvir – would be introduced into the market, and thereby challenging

28

PLAINTIFFS' MEM. CLASS CERTIFICATION
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1    Kaletra's dominance.  Kaletra, unlike Lexiva and Reyataz, carries with it the risk of significant

2    side effects, including increased risk of heart attacks and strokes. (CAC ¶¶ 16, 20-21.)  By the

3    second half of 2003, Reyataz and Lexiva had made steady inroads into Kaletra's share of the

4

5    boosted market. (CAC ¶ 23.)

6        In direct response to the introduction of these competitor drugs, and as part of a scheme to

7    suppress their competitive effectiveness, in 2003, Abbott, overnight, on December 3, 2003, raised

8    the price of Norvir by 400%.  (CAC ¶ 24.)  Abbott did not similarly impose a massive spike in the

9    price of ritonavir when sold as part of Kaletra.  As a result of this massive price increase, rival

10   boosted PIs, although medically superior to Kaletra, were put at a severe competitive

11   disadvantage.  Patients using Norvir to boost Abbott's rival boosted drugs now had to pay a

12   penalty for buying Norvir as a stand-alone product (as opposed to buying it as part of Kaletra). *Id.*

13

14   Due to Abbott's use of its control over the boosting market in this way, Abbott's boosted

15   competitors became substantially more expensive relative to Kaletra.

16        Abbott's conduct had its intended effect on competition in the boosted market.  Abbott

17   successfully impaired its boosted rivals by making them more expensive.  (CAC ¶ 25.)  As a

18   result, Abbott succeeded in halting the decline in Kaletra's market share that had commenced

19

20   with the attempted introduction of new, competing boosted products.  (CAC ¶ 39.)  Abbott's

21   conduct also diminished price competition in the market for boosted PIs, because Abbott's rivals

22   knew that if they cut prices to compete with Kaletra, Abbott could continue to thwart competition

23   by simply raising Norvir's price again.  (CAC ¶ 40.)

24        The classwide pricing data tells the tale of what economic modeling would predict.  Not

25   only did the conduct involve Abbott's customers paying artificially inflated prices for Norvir, the

26   competitive impairment caused by the challenged conduct enhanced Abbott's monopoly power in

27   the boosted market, and permitted Abbott to artificially inflate the price of Kaletra beginning in

28

PLAINTIFFS' MEM. CLASS CERTIFICATION
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1   mid-2005. (Singer Decl. at ¶¶ 8, 37-48.) From December 2003 until June 2005, Abbott waited to

2   see if it had accomplished its goal of impairing the growth of its boosted rivals, and thus kept

3   Kaletra's price steady. However, once it felt it had succeeded sufficiently in neutralizing its

4   boosted rivals' ability to compete on price, Abbott began (safely) inflating Kaletra's price: 13.2%

5   in 2005 and a total of 25% from June 2005 through October 2007. (*Id.* at ¶ 46.) Common

6   evidence is available to show that all class members paid those artificially inflated prices, and

7   

8   were thus overcharged due to the challenged conduct. (*Id.* at ¶¶ 8, 37-40, 41-48.)

9       **B.    *Cascade***

10      On April 11, 2008, this Court denied Abbott's motion to dismiss, which had been based

11  primarily on *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008). *See Meijer,*

12  *Inc., et al. v. Abbott Laboratories*, 2008 U.S. Dist. LEXIS 31816 (N.D. Cal. Apr. 11, 2008)

13  ("MTD Opinion"). This Court made clear that requiring plaintiffs here, in a situation

14  

15  characterized by high initial fixed costs, to satisfy *Cascade*'s below-average-variable-cost test

16  could, in theory, shield conduct that impairs rivals and harms competition, especially potentially

17  new market entrants -- directly contrary to *Cascade*'s intent. *Id.* at *18. Therefore, this Court

18  held that plaintiffs here need not satisfy *Cascade*'s price-based test. *Id.* at *24. This Court

19  

20  recognized that in this case *Cascade* presents an overly stringent, sufficient-but-not-necessary,

21  test of anticompetitive conduct, and that the monopoly leveraging theory already found

22  cognizable and *Cascade*'s exclusionary bundled pricing theory "hypothetically could apply at the

23  same time." *Id.* at *9 n.2.

24      Under the sufficient-but-not-necessary *Cascade* test, if the imputed price of lopinavir

25  exceeds Abbott's average variable costs of selling lopinavir, then Abbott is in a "safe harbor," and

26  antitrust liability would then depend upon Plaintiffs' proving alternate theories of anticompetitive

27  harm. *However*, as Abbott recognizes, the corollary to this "safe harbor" is that if the imputed

28  

761383.1

price of lopinavir in the Kaletra "bundle" is priced *below* Abbott's average variable costs, then

Abbott has failed the *Cascade* test. In other words, if the average variable costs attributable to

lopinavir are greater than $1.64 (which is less than 9% of the price of Kaletra),[5] then Plaintiffs

satisfy *Cascade* and can establish a Section 2 violation on Abbott's own terms.

The economic literature defines variable costs as *avoidable costs* – that is, costs that

would cease if a firm were to stop selling the product in question – which include items such as:

marketing and promotion; shipping; and ongoing clinical trials and studies. (Singer Decl. at ¶¶

32-33.)[6]    Plaintiffs plead, and believe that the evidence obtained to date compellingly shows,

that the stringent (but not necessary) bright-line *Cascade* test can, indeed, be satisfied here with

exclusively class-wide evidence.  (CAC ¶ 41; Singer Decl. at ¶¶ 33, 39-40, 51.)

**C.    Summary of Expert Declaration of Hal Singer, Ph.D.**

Dr. Singer, an economist familiar with the pharmaceutical and health care industries

(Singer Decl. at ¶¶ 11, 14-19), concluded, *inter alia*, that: (1) economic analysis of the antitrust

violation in this case (whether under the *Cascade* standard or another), as with nearly all Section

2 cases, will involve exclusively classwide evidence; and, (2) proof of antitrust injury (or impact)

in the form of overcharges on Norvir and Kaletra on all (or nearly all) members of the Class can

be accomplished with common proof, including: (a) Abbott's own internal projections regarding

---

[5] Abbott appears to have repeatedly conceded that $1.64 is the imputed price of lopinavir. *E.g.*, Abbott Laboratories' Reply Brief in Support of Its Motion to Dismiss, at 6-7 (filed February 21, 2008); Supplemental Brief in Support of its Summary Judgment Motion, at 3, filed in No. C 04-1511 CW, Doc. 491-2 (Apr. 25, 2008).

[6] "[F]ixed production costs of a firm are those costs that do not vary with output *and that would remain even if the firm discontinued production.*" *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1037 (9th Cir. 1981) (emphasis added).   Advertising and promotional expenditures, which in large branded pharmaceutical companies like Abbott average 30% of revenues, are just some variable costs that must be part of the cost computation for *Cascade*. *See* Phillip E. Areeda & Herbert Hovenkamp, III ANTITRUST LAW ¶ 740d2 (rev. ed. 2007) (concluding advertising and promotional costs are variable). Indeed, *any costs which are "avoidable," i.e.*, costs that can be avoided by not selling, are variable costs. *See also* Phillip E. Areeda & Herbert Hovenkamp, III ANTITRUST LAW, pp. 423-434, 437 (2d ed. 2005).

761383.1

1    the competitive effects of its conduct on its own and rivals' sales; (b) application of standard

2    economic theory and models regarding the effects of monopoly pricing, monopoly leveraging,

3    and bundling on pricing; (c) Abbott's own transactional database and other sources of market-

4    wide data on pharmaceutical pricing (including Medi-Span and IMS) reflecting pricing, sales, and

5    market conditions before and after Abbott's Norvir price spike; and, (d) governmental and

6    academic studies demonstrating the economic effects of competition between branded drugs that

7    are close therapeutic substitutes. (*Id.* at ¶¶ 9, 34, 41, 68.) Finally, Dr. Singer found that there are

8    reliable economic methods of computing overcharge damages on Norvir and Kaletra to the class

9    as a whole. (*Id.* at. ¶¶ 49-68.)

10

11

12   **III.    ARGUMENT**

13       **A.    Class Certification is Particularly Appropriate in Antitrust Cases**

14           As this Court has previously recognized, there is an "underlying policy regarding the

15   important role that class actions play in the enforcement of antitrust laws." *Indirect Case*, 2007

16   U.S. Dist. LEXIS 44459, at *11.    When courts are in doubt as to whether certification is

17   warranted [in antitrust cases], courts tend to favor certification. *In re Dynamic Random Access*

18   *Memory Antitrust Litig.*, 2006 WL 1530166, at *3 (N.D. Cal. Jun. 5, 2006) ("*DRAM*") (citations

19   omitted); *see also In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005)

20   ("Class actions play an important role in the private enforcement of antitrust actions.   For this

21   reason, courts resolve doubts in these actions in favor of certifying the class."); *In re Citric Acid*

22   *Antitrust Litig.*, 1996 WL 655791, at *8 (N.D. Cal. Oct. 2, 1996); *Hawaii v. Standard Oil Co. of*

23   *Cal.*, 405 U.S. 251, 262, 266 (1972); *Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D.

24   38, 41 (S.D.N.Y. 1990).

25           In light of the critical role that private class actions play in enforcing antitrust laws, courts

26   have also routinely certified cases specifically alleging monopolization resulting in artificial price

27   inflation.[7]  This case presents a prototypical example of a case for which Rule 23 was designed.

28   ───────────────────
     [7] *See, e.g., In re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D. Cal. 2007); *Morelock Enters., Inc. v.*
     *Footnote continued on next page*

**B.    The Standard for Class Certification Under Rule 23**

As this Court knows, in determining whether to certify a class action, the Court must evaluate whether the plaintiffs have satisfied the threshold requirements of Rule 23(a) as well as the requirements for certification under one of the Rule 23(b) subsections. *Indirect Case*, 2007 U.S. Dist. LEXIS 44459, at *6.  The Court may not consider the merits of the plaintiffs' claims and must take the substantive allegations of the complaint as true. *Id.*; *DRAM*, 2006 WL 1530166, at *3.  A motion for class certification should not become a "mini-trial on the merits." *Buspirone*, 210 F.R.D. at 56.  The Court need only form "a reasonable judgment" on each certification requirement based on the allegations of the complaint and the supplemental evidentiary submissions of the parties. *Citric Acid*, 1996 WL 655791, at *2.

**C.    The Requirements of Rule 23(a) Are Satisfied**

Rule 23(a) enumerates four criteria that must be met before a case may proceed as a class action.  The criteria are:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Plaintiffs satisfy each of these requirements.

**1.    Numerosity**

Numerosity is easily satisfied here. Rule 23(a)(1) permits the certification if the class is so numerous that joinder of all members would be "impracticable."  "Impracticable does not mean impossible, and a plaintiff only need establish the difficulty or inconvenience of joining all members of the class to meet the numerosity requirement." *Whiteway v. Fedex Kinko's Office & Print Servs., Inc.*, 2006 WL 2642528, at *4 (N.D. Cal. Sept. 14, 2006) (internal citations omitted).  While there is no-bright line rule as to how many class members are needed to satisfy

---

*Footnote continued from previous page*

Weyerhaeuser Co., 2004 U.S. Dist. LEXIS 28270 (D. Ore. Dec. 16, 2004); *Image Tech. Servs. v. Eastman Kodak Co.*, 1994 U.S. Dist. LEXIS 12652 (N.D. Cal. Sept. 2, 1994); *J.B.D.L.*, 225 F.R.D. 208; *Relafen*, 218 F.R.D. 337; *Buspirone*, 210 F.R.D. 43; *Lorazepam*, 202 F.R.D. 12; *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279 (D.N.J. 1997); *Jennings Oil*, 80 F.R.D. 124; *Du Pont Glore Forgan, Inc. v. American Tel. & Tel. Co.*, 69 F.R.D. 481 (S.D.N.Y. 1975); *Robertson v. National Basketball Ass'n*, 389 F. Supp. 867 (S.D.N.Y. 1975); *In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269, 276 (D.D.C. 1972).

761383.1

1    the numerosity requirement, joinder has been considered impracticable where the class includes

2    40 members. *Californians for Disability Rights, Inc. v. California Dep't of Transp.*, 2008 U.S.

3    Dist. LEXIS 19766, at *41 (N.D. Cal. March 13, 2008); *see also Ovcon*, 246 F.R.D. at 305-06 (30

4    class members sufficient).  Joinder is also considered impracticable when the members of the

5    proposed class are geographically dispersed throughout the United States. *Rubber Chems.*, 232

6    F.R.D. at 351; *DRAM*, 2006 WL 1530166, at *3.  Further, Plaintiffs are not required to identify

7    the exact number of class members.  If "general knowledge and common sense" indicate that the

8    class is large, the numerosity requirement has been satisfied. *Indirect Case*, 2007 U.S. Dist.

9    LEXIS 44459, at *17 (citing 1 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS

10    § 3.3 (4th ed. 2002)).

11        Here, Dr. Singer reviewed Abbott's transactional sales data and determined, preliminarily,

12    ⟨REDACTED⟩                    (Singer Decl. at ¶ 5.)  Dr. Singer has

13    further observed that Class members are dispersed throughout the United States. *Id.* The Class

14    includes mainly pharmaceutical wholesalers,[8] but also a handful of other entities, including mail

15    order pharmacies, and some hospitals located throughout the country.  (*Id.* at ¶ 35.)  This is more

16    than sufficient to satisfy the numerosity requirement. *See Busiprone*, 210 F.R.D. at 57 (holding

17    that "proposed class contains possibly over a hundred members, which is clearly sufficient to

18    meet Rule 23(a)'s numerosity requirement"); *K-Dur*, slip op. at 6-7 (more than 40 class

19    members); *Nifedipine*, 246 F.R.D. at 368-69 (85 members); *Cardizem*, 200 F.R.D. at 303 (80).

20        **2.    Multiple Common Questions of Law and Fact Are Present**

21        The second requirement for maintaining a class action under Rule 23 -- also easily

22    established here -- is that "there are questions of law *or* fact common to the class." Fed. R. Civ.

23    P. 23(a)(2) (emphasis supplied).   A finding of commonality does not require that all class

24    members share identical claims. *Whiteway*, 2006 WL 2642528, at *4.  The existence of shared

25    legal issues with divergent factual predicates is sufficient to satisfy the commonality requirement,

26

27

28    [8]

    ⟨REDACTED⟩

1    as is a common core of salient facts coupled with disparate legal remedies within the class.

2    *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

3        Commonality is easily established in antitrust actions alleging monopolization. *See*

4    *Jennings Oil*, 80 F.R.D. at 128 (monopolization claims pose "questions that are undoubtedly

5    common to all the members of the putative class"); *Relafen*, 218 F.R.D. at 342; *J.B.D.L.*, 225

6    F.R.D. at 213 ("whether [defendant] acquired and/or maintained a monopoly through

7    anticompetitive means is an issue common to all members of the class[;] . . . this case satisfies the

8    commonality requirement"); *Buspirone*, 210 F.R.D. at 57.

9        In certifying the indirect purchaser class, this Court found that commonality was satisfied

10   because the allegations "stem from the same source, namely, Defendant's alleged anticompetitive

11   conduct in the pricing of Norvir[.]" *Indirect Case*, 2007 U.S. Dist. LEXIS 44459, at *17 *see also*

12   *Relafen*, 218 F.R.D. at 342 (finding that common factual questions include whether defendant

13   engaged in anticompetitive conduct and whether such behavior resulted in overcharges).

14       The same is true for the direct purchaser case. Common issues of law and fact include:

15   (1) whether Abbott intentionally and unlawfully impaired or impeded competitors in the boosting

16   and/or boosted markets; (2) whether Abbott unlawfully attempted to monopolize the boosted

17   market; (3) whether Abbott engaged in anticompetitive conduct in order to leverage its monopoly

18   in the boosting market to impair rivals in the boosted market, and/or to obtain, maintain or extend

19   monopoly power in the boosted market; (4) whether the geographic market for both PI-boosting

20   drugs and boosted-PIs is the United States; (5) whether Abbott has monopoly power in a relevant

21   market defined as the boosting market; (6) whether Abbott intended to impair competition in the

22   boosted market and/or to maintain or extend monopoly power in the boosted market, and in fact

23   impaired rivals and/or maintained or extended monopoly power in the boosted market; (7)

24   whether there was and is a dangerous probability that Abbott would succeed in monopolizing the

25   boosted market; (8) whether Abbott had pro-competitive reasons for its conduct; (9)the effects of

26   Abbott's attempted monopolization on prices of boosted PIs; (10) whether Plaintiffs and other

27   members of the Class have been damaged by paying more for Norvir and/or Kaletra as a result of

28   Abbott's unlawful behavior; and, (11) the proper measure of damages.

    PLAINTIFFS' MEM. CLASS CERTIFICATION
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1    These issues present a core of commonality, focusing on the central issue of whether

2    Abbott's conduct violates Section 2 of the Sherman Act. *See J.B.D.L.*, 225 F.R.D. at 213

3    (certifying class of direct purchasers of the drug Premarin and finding: "at a minimum, it appears

4    that whether [Defendant] acquired and/or maintained a monopoly through anticompetitive means

5    is an issue common to all members of the class and resolution of this issue would certainly

6    advance the litigation"). In sum, the commonality prong of Rule 23 has been satisfied.

7          **3.    Class Representatives' Claims Are Typical of the Claims of the Class**

8    Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

9    of the claims or defenses of the class." "The test for typicality is 'whether other members have

10   the same or similar injury, whether the action is based on conduct which is not unique to the

11   named plaintiffs, and whether other class members have been injured by the same course of

12   conduct.'" *Indirect Case*, 2007 U.S. Dist. LEXIS 44459, at *18 (quoting *Hanon v. Dataproducts*

13   *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). The Court also considers whether Plaintiffs' claims

14   "arise from the same event, practice or course of conduct that gives rise to the claims of absent

15   class members and if their claims are based on the same legal or remedial theory." *DRAM*, 2006

16   WL 1530166, at *4 (citation and internal quotes omitted).

17   Here, Plaintiffs' claims arise from the same anticompetitive behavior giving rise to the

18   claims of the Direct Purchaser Class, and the relief that Plaintiffs seek is common to all Class

19   members. Plaintiffs and all Class members purchased Kaletra and/or Norvir and claim they were

20   harmed by the alleged artificial inflation in prices they paid due to Abbott's unlawful and

21   monopolistic practices. (CAC ¶¶ 19-40.) The typicality requirement is therefore satisfied here

22   because Plaintiffs and members of the proposed Class are all proceeding under the same legal

23   theories and must all present the same proof concerning Abbott's anticompetitive conduct. *See*

24   *Citric Acid*, 1996 WL 655791, at * 3 ("The legal theory that plaintiffs rely on is antitrust liability.

25   Because plaintiffs and all class members share these claims and this theory, the representatives'

26   claims are typical of all."); *Relafen*, 218 F.R.D. at 343 (plaintiffs' claims typical where "core

27   pattern of alleged anti-competitive conduct" also "gives rise to all class members' claims");

28   *Cardizem*, 200 F.R.D. 297, 304 ("Here, as in other antitrust cases, the claims of the named

-- 12 --

1    representatives and the claims of the class members arise from the same events"); *see also Live*

2    *Concert*, 247 F.R.D. at 117.

3            **4.**     **The Class Representatives Will Fairly and Adequately Protect the**

                  **Interests of the Class**

4

5            The final requirement of Rule 23(a) -- that the proposed class representatives "fairly and

6    adequately protect the interests of the class" -- is also easily established here. The Ninth Circuit

has articulated two criteria for determining adequacy: (1) whether the named plaintiffs have any

7    conflicts of interest with other class members, and (2) whether the named plaintiffs and their

8    counsel will prosecute the action vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1020.

9    The representation is adequate if "the class representatives are not disqualified by interests

10   antagonistic to the remainder of the class" and "the attorney representing the class is qualified and

11   competent." *In re Beer Distrib. Antitrust Litig.*, 188 F.R.D. 549, 554 (N.D. Cal. 1998).

12

13           **a.**     __Absence of Conflict__

14           There are no actual or potential conflicts between the Direct Purchaser Class members and

the representative Plaintiffs. All Plaintiffs and Class members directly purchase and resell

15   prescription drugs (or are the assignees of direct purchasers). Each Class member has the same

16   interest in establishing Abbott's liability and maximizing the recoverable overcharges in this case.

17   By pursuing this litigation on their behalf, the representative Plaintiffs will necessarily advance

18   the common interests of the Class. *See Rubber Chems.*, 232 F.R.D. at 351 (finding absence of

19   conflicts because "the named plaintiffs and the putative class members were allegedly injured in

20   the same manner and seek the same relief"); *DRAM*, 2006 WL 1530166, at *6 (concluding that

21   there are "no discernible conflicts of interest" where "the named plaintiffs allege that all members

22   of the proposed class paid artificially inflated prices"). There exist no "fundamental" conflicts

23   between the representative Plaintiffs and the Direct Purchaser Class members. *See Local Joint*

24   *Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th

25   Cir. 2001) (requiring a fundamental conflict of interest in order to defeat adequacy of

26   representation).

27

28

761383.1

1    Moreover, the very same named plaintiffs here have been found to be adequate class

2    representatives for a nearly identical class of pharmaceutical direct purchasers pursuing

3    overcharge damages due to alleged anticompetitive conduct in several other recent antitrust

4    cases.[9] The named plaintiffs clearly satisfy Rule 23's adequacy requirement.

5                    **b.    Qualifications of Proposed Class Counsel**

6        Plaintiffs intend to separately file under Rule 23(g) for appointment of class counsel by

7    the Court shortly. In those papers, counsel will describe their respective qualifications and their

8    satisfaction of the requirements of Rule 23 (a)(4) and (g). All of the proposed class counsel have

9    been deemed adequate class counsel in numerous prior antitrust class actions, including for the

10   same basic class in cases involving the pharmaceutical industry. Accordingly, this requirement

11   shall be easily satisfied.

12       **C.    The Requirements of Rule 23(b)(3) Are Satisfied**

13       Just as in the multiple recent pharmaceutical antitrust cases and in the *Indirect Case*,

14   common issues will predominate in this litigation over any conceivable individualized issues.

15   Rule 23(b)(3) requires: (1) that the Court find that common questions of law or fact predominate

16   over individual questions; and (2) that a class action is superior to other available methods of

17   adjudication. *Indirect Case*, 2007 U.S. Dist. LEXIS 44459, at *23. Plaintiffs easily satisfy both

18   requirements.

19               **1.    Predominance**

20       Litigation of this case will necessarily focus on common issues of law and fact. In

21   determining whether common issues predominate, the Court must "identify the issues involved in

22   the case and determine which are subject to 'generalized proof' and which must be the subject of

23   individualized proof." *DRAM*, 2006 WL 1530166, at *6. In its analysis, the Court should assess

24   whether there is "a common nucleus of operative facts." *Thomas & Thomas Rodmakers, Inc., v.*

25   *Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002)(citation omitted).

26   _____

27   [9] *See Ovcon*, 246 F.R.D. at 305 (Meijer, RDC, and LWD are adequate class representatives to a class of pharmaceutical direct purchasers); *Nifedipine*, 246 F.R.D. at 369 (same); *K-Dur*, No. 01-1652, slip op. at 19 (same for LWD); *Cardizem*, 200 F.R.D. at 306 (same); *Relafen*, 218 F.R.D. at 343 (same); *Buspirone*,

28   210 F.R.D. at 57-58 (same).

1    "Because no precise test can determine whether common issues predominate, the Court must

2    pragmatically assess the entire action and the issues involved." *Whiteway*, 2006 WL 2642528, at

3    *10. "'When common questions present a significant aspect of the case and they can be resolved

4    for all members of the class in a single adjudication, there is clear justification for handling the

5    dispute on a representative rather than an individual basis.'" *Indirect Case*, 2007 U.S. Dist.

6    LEXIS 44459, at *24 (quoting *Hanlon*, 150 F.3d at 1022). *See also In re Vitamins Antitrust*

7    *Litig.*, 209 F.R.D. 251, 257 (D.D.C. 2002).

8        This case clearly embodies the general rule announced by the Supreme Court that

9    "[p]redominance [of common issues] is a test readily met in certain cases alleging . . . violations

10   of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Common

11   issues clearly predominate here because, as is typical of antitrust cases, the focus is on the

12   defendant's conduct and not the conduct of individual class members. *DRAM*, 2006 WL 1530166,

13   at *7; *see also Thomas & Thomas Rodmakers*, 209 F.R.D. at 167.

14       To prevail on the merits in the monopolization claims relating to the boosted and boosting

15   markets, Plaintiffs must establish: (1) the possession of monopoly power in the relevant market;

16   (2) willful acquisition or maintenance of that power; and (3) antitrust injury or impact. *In re*

17   *Abbott Labs. Norvir Antitrust Litig.*, 442 F. Supp. 2d 800, 805 (N.D. Cal. 2006). *See also Rubber*

18   *Chems.*, 232 F.R.D. at 352; *K-Dur*, No. 01-1652, slip op. at 21.[10] As detailed below, each will be

19   proven with evidence relating to all class members. Moreover, Plaintiffs will be able to quantify

20   the damages to the class as a whole using common evidence and standard economic models and

21   methods.

22

23

24

_____

25   [10] In proving attempted monopolization, Plaintiffs must show: (1) a specific intent to control prices or
     destroy competition in the relevant market; (2) predatory or anticompetitive conduct directed to
26   accomplishing the unlawful purpose; (3) a dangerous probability of success; and (4) causal antitrust injury.
     *Norvir*,442 F. Supp.2d at 805. *See also Jensen Enters., Inc. v. Oldcastle, Inc.*, 2006 U.S. Dist. LEXIS
27   68262, at *22 (N.D. Cal. Sept. 7, 2006). The requirements of these claims are similar, differing only in the
     "'requisite intent and the necessary level of monopoly power.'" *Norvir*, 442 F. Supp. 2d at 805 (quoting
28   *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997)).

PLAINTIFFS' MEM. CLASS CERTIFICATION
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1            a.    **Violation of the Antitrust Laws**

2            Proof of the antitrust violation, namely the first two elements of the claims – proving (i)

3      possession of monopoly power, and (ii) exclusionary conduct that enhanced or maintained that

4      power – will be accomplished with common methods and evidence. Just as in the indirect case,

5      the relevant proof of Abbott's misconduct will not vary among Class members. Plaintiffs allege,

6      *inter alia*, that Abbott leveraged its monopoly position as the sole provider of Norvir in order to

7      disadvantage competitors in the boosted market, and enhance its own monopoly power. Dr.

8      Singer has concluded that economic analysis of the alleged antitrust violation under one or more

9      standard economic approach (he discusses both the "consumer welfare" and "*Cascade*"

10     approaches) would involve exclusively class-wide evidence and methods. (Singer Decl. at ¶¶ 22-

11     33.)

12           If pursued individually, each Class member would have to prove the exact same course of

13     conduct, using the same documents and witnesses. *See Live Concert*, 247 F.R.D. at 132

14     ("Plaintiffs allege that *Clear* Channel engaged in a calculated course of conduct to leverage its

15     market power . . . [and] common evidence can be used to show that Clear Channel engaged in

16     this overall course of conduct."). Disputes over, for instance, whether Abbott's conduct meets the

17     test for monopoly leveraging or the more stringent *Cascade* standard, the definition and scope of

18     the relevant product market, and whether and the extent to which Abbott possesses monopoly

19     power will necessarily be resolved by evidence and methods common to all class members. *See*

20     (Singer Decl. at, *e.g.*, ¶¶ 6-7, 26-27, 28-33); *see also, e.g., Christiana Mortgage Corp. v.*

21     *Delaware Mortgage Bankers Ass'n*, 136 F.R.D. 372, 373 (D. Del. 1991) (proof of monopoly

22     power in relevant market is made by common evidence); *Jennings Oil*, 80 F.R.D. at 128 (proof of

23     elements of monopolization claim "undoubtedly common to all the members of the . . . class").

24     Unsurprisingly, courts repeatedly have recognized that actions alleging monopolization, resulting

25     in supra-competitive pricing, raise predominantly common liability issues. *J.B.D.L.*, 225 F.R.D. at

26     219; *Relafen*, 218 F.R.D. at 345; *Buspirone*, 210 F.R.D. at 57. This case is no different.

27

28

PLAINTIFFS' MEM. CLASS CERTIFICATION
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1                   **b.**    <u>**Antitrust Injury**</u>

2         Plaintiffs will also demonstrate the fact of antitrust injury (or antitrust impact) suffered by

3  all Class members using evidence and methods that are entirely common and of class-wide

4  application.   Fact of injury involves two related inquiries: (1) whether the plaintiff or class

5  member paid more for the product or service (*i.e.*, was "overcharged"); and (2) whether there is a

6  causal relationship between the violation and the overcharge. *Live Concert*, 247 F.R.D. at 133.

7  To establish predominance, Plaintiffs need only establish that the fact of injury, not the amount of

8  damages, can be proved through common evidence. *Id.* at 135.

9         Courts have repeatedly held that monopolization claims under Section 2 are conducive to

10  proof of class-wide antitrust injury. *Live Concert*, 247 F.R.D. at 144 ("The Court finds that

11  Plaintiffs have demonstrated that several generally accepted methodologies can be used to prove

12  class-wide impact through the use of common evidence."); *Morelock Enters.*, 2004 U.S. Dist.

13  LEXIS 28270, at *5; *J.D.B.L.*, 225 F.R.D. at 219 ("In short, the Court finds that Plaintiffs have

14  demonstrated a colorable method for demonstrating class-wide impact and that common issues

15  will predominate over individual issues.").

16         Indeed, this Court has held that the indirect purchaser class could establish common proof

17  of injury despite issues raised with regard to variations in state laws, and relating to whether "all

18  members of the class suffered damage" as a result of the challenged conduct. *Indirect Case*, 2007

19  U.S. Dist. LEXIS 44459, at *26-28 (finding indirect purchaser plaintiffs made a sufficient

20  showing that impact on indirect purchasers could be shown on a classwide basis and refusing to

21  decide in a "battle of the experts").

22         While impact on *indirect* purchasers often involves assessing whether, and the extent to

23  which, overcharges are passed on by direct purchasers through the chain of distribution, injury to

24  *direct* purchasers occurs, as a matter of law, at the moment a product is bought at an artificially

25  inflated price. *J.B.D.L.*, 225 F.R.D. at 216 ("[a]ntitrust injury is considered complete when the

26  direct purchaser pays an illegal overcharge and whether he [is] able to pass through the

27  overcharge to indirect purchasers is irrelevant"). "Pass on" issues are thus legally irrelevant in

28  direct purchaser cases. In any event, it logically follows that if common proof is available to

1  show impact on indirect purchasers down the chain of distribution, it *must* be available to show

2  impact on direct purchasers – who need only show they purchased at least one unit of Norvir *or*

3  Kaletra directly from Abbott at a price artificially inflated by Abbott's conduct.

4        Five additional factors militate toward a finding of predominance here. *First*, Plaintiffs

5  need only put forth a "plausible methodology to demonstrate that antitrust injury can be proven

6  on a class-wide basis." *DRAM*, 2006 WL 1530166, at *9; *see also K-Dur*, No. 01-1652, slip op. at

7  23, 32. *Second*, the issue here is not whether Plaintiffs can prove their case on the merits and

8  show antitrust injury as a matter of fact, but rather only that Plaintiffs demonstrate impact with

9  classwide evidence. The Court "'cannot weigh in on the merits of plaintiffs' substantive

10  arguments, and must avoid engaging in a battle of expert testimony.'" *Indirect Case*, 2007 U.S.

11  Dist. LEXIS 44459, at *28 (quoting *DRAM*, 2006 WL 1530166, at *9).[11]  *Third*, "the 'impact'

12  element of an antitrust claim need not be established as to each and every class member; rather, it

13  is enough if the plaintiffs' proposed method of proof promises to establish widespread injury to

14  the class as a result of the defendant's antitrust violation." *In re Northwest Airlines Corp.*

15  *Antitrust Litig.*, 208 F.R.D. 174, 223 (E.D. Mich. 2002)(internal quotes and citation omitted);

16  *Rubber Chems.*, 232 F.R.D. at 353; *Cardizem*, 200 F.R.D. at 307; *J.B.D.L.*, 225 F.R.D. at 219.

17        *Fourth*, injury or impact can be established by presenting classwide evidence showing

18  that the alleged anticompetitive conduct artificially inflated prices above a competitive level.

19  *Rubber Chems.*, 232 F.R.D. at 352-53 (holding that if plaintiff shows that anticompetitive conduct

20  "resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser

21  who negotiated an individual price suffered some injury"); *In re Linerboard Antitrust Litig.*, 305

22  F.3d 145, 151 (3d Cir. 2002) ("If, in this case, a nationwide conspiracy is proven, the result of

23  which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a

24  competitive regime, an individual plaintiff could prove fact of damage simply by proving that the

25  free market prices would be lower than the prices paid and that he made some purchases at the

---

26

27  [11] *See also Live Concert*, 247 F.R.D. at 144 ("The operative question here is not whether the plaintiffs can establish class-wide impact, but whether class-wide impact may be proven by evidence common to all class members."); *K-Dur*, No. 01-1652, slip op. at 32; *Cardizem*, 200 F.R.D. at 311; *J.B.D.L.*, 225 F.R.D.

28  at 219; *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 618 (N.D. Ga. 1997).

761383.1

1    higher price.")(quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir. 1977)); *Relafen*,

2    218 F.R.D. at 344; *Nifedipine*, 246 F.R.D. at 371.  Thus, classwide methods and evidence

3    demonstrating that Abbott's unlawful conduct did, in fact, inflate the prices of Kaletra and Norvir,

4    suffices to satisfy the predominance requirement.

5        ***Fifth***, here, Plaintiffs not only show that class-wide evidence is available to prove that

6    Abbott charged artificially inflated prices for Norvir and Kaletra as a result of the challenged

7    conduct (which is all that is required), but go further, by also showing, through the Declaration of

8    Dr. Singer, that due to the composition of the Class and the nature of Class purchasing practices,

9    Abbott's artificial price inflation *necessarily* inflated prices to all direct purchasers (on at least

10   some, if not most, of their respective purchases).

11

## REDACTED

12

13   testimony of Joseph Fiske, Aug. 15, 2007, at 55.)  Moreover, those few class members that are

14   not wholesalers (mail order pharmacies; hospitals) typically pay a direct or list price, or receive

15   discounts or rebates that are a function of, or inflated in the context of, the list price. *Id.*

16   Accordingly, common evidence showing that conduct artificially inflates Abbott's list prices,

17   constitutes common proof that *all* class members are overcharged.[12]

18       Dr. Singer demonstrates that common methods and evidence are indeed available to prove

19   that Class members paid overcharges on their Norvir and Kaletra purchases, including: (1)

20   Abbott's internal projections regarding the effects of its conduct; (2) application of standard

21   economic theory and models regarding the effects of monopoly pricing, monopoly leveraging,

22   and bundling on pricing; (3) Abbott's own transactional database and other sources of market-

23   wide data on pharmaceutical pricing (including Medi-Span and IMS) reflecting pricing, sales, and

24   market conditions before and after Abbott's Norvir price spike; and, (4) governmental and

25

26

---

27   [12] *See Rubber Chems.*, 232 F.R.D. at 352-53; *In re Carbon Black Antitrust Litig.*, 2005 U.S. Dist. LEXIS
     660 (D. Mass. Jan. 18, 2005) (predominance satisfied if negotiated price which class members paid
28   "depended in some way on the price fixed list prices").

1   academic studies demonstrating the economic effects of competition between branded drugs that

2   are close therapeutic substitutes. (Singer Decl. at ¶¶ 9, 34, 41, 68.)

3        Because the very anticompetitive conduct in this case involves a massive inflation of

4   price, proof of impact resulting from that conduct is exceedingly straightforward and classwide.

5        With regard to Norvir overcharges, Abbott's 400% Norvir price hike had a clear, direct,

6   and easily observable marketwide effect on Norvir prices. Because all Class members paid a list

7   or direct price for Norvir, or a price relating to list for at least some of their purchases from

8   Abbott, raising list price as Abbott admittedly did, necessarily inflated the price each Class

9   member paid for Norvir. (*Id.* at ¶¶ 37-40.)[13]

10       Proof that Class members were overcharged on their Kaletra purchases will also be

11  exclusively class-wide. According to Dr. Singer, the Kaletra impact analysis will involve two

12  steps: (a) proving that Abbott was able to leverage its monopoly in the boosting market to

13  suppress competition in the boosted market; and (b) showing that by suppressing rivals' market

14  share, beginning in mid-2005, Abbott was able to take list price increases on Kaletra which would

15  not have been possible but for the challenged conduct. (*Id.* at ¶ 41.) Dr. Singer shows that proof

16  of both steps in this analysis would involve exclusively common methods and evidence. (*Id.* at ¶¶

17  41, 42-48.) Of course, just as with Norvir, proof that Abbott artificially inflated the list price of

18  Kaletra as a result of the challenged conduct is, necessarily, proof that all (or nearly all) Class

19  members suffered antitrust impact.

20       In sum, proving impact in the form of overcharges here will not involve examination of

21  evidence individual to any one Class member. Rather, it will be accomplished using evidence of

22  almost exclusively class-wide applicability. *E.g., In re NASDAQ Market Makers Antitrust Litig.*,

23  169 F.R.D. 493, 520 (S.D.N.Y. 1996) ("[p]laintiffs intend to prove the effectiveness of

24

---

[13] Dr. Singer also shows that the Norvir overcharge could also be computed with class-wide evidence
25  taking the *Cascade* test into account by computing the overcharge only on that portion of Abbott's price
increase that exceeded the *Cascade* "safe harbor" (Singer Decl. at ¶¶ 39-40) – an analysis that this Court
26  has already held is too stringent given the facts of this case, but nonetheless provides an alternative
sufficient-but-not-necessary paradigm for plaintiffs to demonstrate anticompetitive conduct. For this
27  analysis, Plaintiffs would compute Norvir overcharges only on that portion of the price increase that
caused the imputed price of lopinavir to drop below Abbott's average variable costs for lopinavir.
28  Computing these figures is an exercise common to all members of the proposed Class. (*Id.*)

761383.1

1   Defendants' conspiracy by using economic theory, academic studies, data sources, and statistical

2   techniques . . . that are common to the entire class").

3                              c.    **Damages**

4          As discussed above, Plaintiffs allege that as a result of Abbott's conduct Class members

5   incurred damages in the form of "overcharges," *i.e.*, the difference between the price that was

6   actually paid and the price that would have been paid had the anti-competitive conduct not

7   occurred. "The monopoly overcharge is the excess price at the initial sale[.]" *Paper Sys., Inc. v.*

8   *Nippon Paper Indus., Co.*, 281 F.3d 629, 633 (7th Cir. 2002) (Easterbrook, J.). For over twenty-

9   five years courts have accepted that direct purchasers have the right to pursue damages measured

10  as overcharges under Section 4 of the Clayton Act. *See Illinois Brick Co. v. Illinois*, 431 U.S.

11  720, 729 (1977) ("the overcharged direct purchaser . . . is the party 'injured in his business or

12  property' within the meaning of [the Clayton Act]").

13         Plaintiffs' burden with respect to showing antitrust damages at the class certification stage

14  is a limited one. *Rubber Chems.*, 232 F.R.D. at 354; *DRAM*, 2006 WL 1530166, at *10;

15  *Cardizem*, 200 F.R.D. at 321. The required quantum of proof necessary to prove the *amount* of

16  damages is less than that required to prove the fact of damages. *Live Concert*, 247 F.R.D. at 144

17  (citing *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1215-16 (9th Cir. 1983)). For instance, all

18  that is required is a colorable method showing that damages to the class can be calculated on an

19  aggregate basis. *See, e.g., Cardizem*, 200 F.R.D. at 324 ("standard statistical techniques" can be

20  used to estimate damages in the aggregate); *Lorazepam*, 202 F.R.D. at 30; *NASDAQ*, 169 F.R.D.

21  at 525. Plaintiffs are not required to advance "a precise damage formula." *Rubber Chems.*, 232

22  F.R.D. at 354. Rather, courts reject a method for calculating damages at the class certification

23  stage only when the proposed method is "so insubstantial as to amount to no method at all." *Id.*;

24  *DRAM*, 2006 WL 1530166, at *10; *see also K-Dur*, No. 01-1652, slip op. at 34.

25         Significantly, a number of courts "have been satisfied that a common methodology for

26  proving class-wide damages exists" in cases alleging anticompetitive behavior concerning

27  prescription drugs. *Ovcon*, 246 F.R.D. at 312 (citing *Cardizem*, 200 F.R.D. at 321-25; *Buspirone*,

28  210 F.R.D. at 58; and *J.B.D.L.*, 225 F.R.D. at 217-19). Moreover, the existence of individual

PLAINTIFFS' MEM. CLASS CERTIFICATION
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW.

761383.1

1   issues with respect to damages does not defeat class certification. *Blackie v. Barrack*, 524 F.2d

2   891, 905 (9th Cir. 1975); *Live Concert*, 247 F.R.D. at 147 ("even if [Defendant's expert's]

3   criticisms are valid and the calculation of the amount of damages requires the analysis of some

4   individual issues, this does not preclude class certification"); *Cardizem*, 200 F.R.D. at 321. Even

5   the theoretical need to determine damages individually would not pose an obstacle to class

6   certification. *Little Caesar Enters. v. Smith*, 172 F.R.D. 236, 267 (E.D. Mich. 1997) ("there is

7   substantial case authority holding that the need to compute individual damages will not prevent

8   class certification on issues of liability").

9          Due to, *inter alia*, the existence of a variety of common sources of proof, including (a)

10  economic models forecasting the effects of exclusionary leveraging and bundling, (b) the

11  availability of Abbott's and Abbott's competitors' forecasts of the market participants' expected

12  effects of Abbott's conduct on competition in the boosted market, (c) the ability to obtain

13  Abbott's and its rivals' cost data in discovery, and (d) the existence of an abundance of publicly

14  available data regarding sales and pricing in the pharmaceutical markets as well as Abbott's own

15  transactional database reflecting prices and sales for Norvir and Kaletra before and after the

16  December 2003 price hike, Dr. Singer concludes that it will be feasible to calculate aggregate

17  damages to the Class as a whole using well-established class-wide methodologies. *See, e.g.*,

18  Singer Decl. at ¶¶ 50-68.

19         *Norvir Overcharge Damages.*  Dr. Singer found that aggregate overcharge damages to the

20  class as a whole can be computed using common evidence and reliable methodologies.

21         *First*, the standard way of computing antitrust damages would be to compare the actual

22  world (with the price hike) to a but-for world where Abbott did not take the price increase.  Per

23  unit overcharges are simply the average actual price paid by Class members less the but-for price

24  they would have paid (*i.e.*, the "before" price absent the price hike) multiplied by the total amount

25  purchased by Class members during the Class period. (*See* Singer Decl. at ¶ 51, 53.)  The volume

26  of affected Class purchases is drawn from Abbott's own sales database produced in this litigation.

27         *Second*, were Plaintiffs to apply the *Cascade* test, Norvir overcharges would be computed

28  only on that portion of the Norvir price increase that exceeded the theoretical *Cascade* "safe-

1    harbor," *i.e.*, the portion of the Norvir price hike that caused the imputed price of lopinavir to

2    drop below Abbott's average variable costs for lopinavir. This exercise is common to all Class

3    members, and can be accomplished using standard economic methods. (*Id.*)[14]

4        ***Kaletra (lopinavir) Overcharge Damages***. Computing aggregate overcharge damages to

5    the Class on Kaletra purchases is similarly straightforward and can be done using standard

6    economic models and common evidence. (*Id.* at ¶¶ 52, 54-68.) It involves taking the average

7    actual price of Kaletra, less the average but-for price Class members paid for Kaletra (*i.e.*, the

8    price absent the challenged conduct), and multiplying that by the total volume purchased by the

9    Class.

10        As explained above, the economic theory supporting Kaletra overcharges is that Abbott's

11    conduct suppressed price competition in the boosted market and allowed Abbott -- in the face of

12    the challenges posed by the threat of the new, superior, boosted competitor drugs -- to begin

13

14    # REDACTED

15        The common evidence cited in Dr. Singer's report (including, *e.g.*,

16    governmental and academic studies of competition in the pharmaceutical industry, standard

17    economic theories, internal records, and data from Abbott) is available not only to demonstrate

18    that absent its 400% Norvir price increase, Abbott would have been forced to lower Kaletra's

19    price to fend off its new rivals, but also to assist in quantifying the extent of that price effect.

20        In his Declaration, Dr. Singer identifies specific econometric models for estimating the

21    but-for price for Kaletra, which is an important step in the aggregate damages analysis relating to

22    Kaletra overcharges. (*See* Singer Decl. at ¶¶ 54-67, describing types of models, including Nash-

23    Bertrand Differentiated Products Models and Raising-Rivals'-Cost Model.) Each of these models

24    [14] Indeed, based on certain of Abbott's own documents and using standard economic theory and methods,
25    Dr. Singer preliminarily, and for demonstrative purposes only, performed a *Cascade* "safe harbor"
    analysis. He observed that Abbott's 400% price increase was substantially in excess of any *Cascade* "safe
26    harbor," and would be sufficient to substantially impair equally efficient rivals as long as the Norvir price
    exceeded ⟨⟩ (Abbott raised the price for Norvir to ⟨⟩ ). (Singer Decl. at ¶ 51; *see also* ¶¶ 39-40.)
27    For purposes of the damages analysis, if one were to employ the *Cascade* "safe harbor," the but-for Norvir
    price would be set at ⟨⟩ , or just under the *Cascade* threshold. (*Id.* at ¶ 40.)

28    # REDACTED

1    employs classwide evidence and methods to compute overcharges on Kaletra to the class as a

2    whole. (*Id*; *see also id.* at 68.)

3           **2.    Superiority**

4           Certifying this case as a class action is superior to any other method that may exist for

5    resolving this case, as required by Rule 23(b)(3). *First*, the class mechanism here would avoid

6    the unnecessary duplicative expenditures of time and resources by the Court and the parties that

7    would be incurred if each individual plaintiff were to proceed separately. For support for this

8    proposition, the Court need look no further than its own order in the *Indirect Case*, 2007 U.S.

9    Dist. LEXIS 44459, at *28 (forcing individual class members to file their own suits is inefficient

10   and not superior to class treatment). *See also DRAM*, 2006 WL 1530166, at *11 ("Indeed, the

11   only difficulties likely to be encountered in this case would result from not certifying the class,

12   given the incredible expenditure of time and resources that would result -- from both the court's

13   and the parties' perspectives -- in requiring each class member's action to proceed

14   independently."); *Whiteway*, 2006 WL 2642528, at *11 ("A class action is superior to multiple

15   individual lawsuits. The needless expenditure of additional time, effort and money that would be

16   attendant to numerous individual suits is greatly reduced[.]").

17          *Second*, the extremely high cost of proceeding individually (with expert expenses alone

18   often extending well into the seven figures) makes class certification the only practical and viable

19   means for most of the Direct Purchaser Class members to vindicate their rights, even for the

20   handful of Class members with claims extending, potentially, into the hundreds of thousands of

21   dollars (or higher). As this Court noted in the *Indirect Case*: "In antitrust cases such as this, the

22   damages of individual consumers are likely to be too small to justify litigation, but a class action

23   would offer those with small claims the opportunity for meaningful redress." *Indirect Case*, 2007

24   U.S. Dist. LEXIS 44459, at *28. The same is true, albeit to a different degree, with respect to the

25   Direct Purchaser Class Case. *See also In re Potash Antitrust Litig.*, 159 F.R.D. 682, 699 (D.

26   Minn. 1995) ("[T]he cost associated with individual claims may require claimants with

27   potentially small claim amounts to abandon otherwise valid claims simply because pursuing those

28   claims would not be economical. This in turn would result in unjustly enriching the Defendants;

761383.1

1    precisely the result antitrust laws are designed to remedy."). The mere "presence of large

2    claimants in the class does not make a class action an inferior method of adjudicating the case."

3    *J.B.D.L.*, 225 F.R.D. at 220. *See also Cardizem*, 200 F.R.D. at 325. **Third**, certifying this case as a

4    class action would avoid the possibility of a hundred different claims being brought, potentially in

5    different jurisdictions at different times, raising the possibility of inconsistent outcomes that may

6    result from individual litigation of these claims. *Whiteway*, 2006 WL 2642528, at *11 (noting that

7    "the potential for differing outcomes is avoided" by certifying the class).

8       **Finally**, this case is readily manageable as a class action. The issues are limited and

9    overwhelmingly common, the Class is far smaller and the issues more focused than similar cases

10   that have been managed successfully through settlement or trial. *See, e.g., In re Domestic Air*

11   *Transp. Antitrust Litig.*, 137 F.R.D. 677 (N.D. Ga. 1991) (class numbering close to ten million

12   certified); *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 121 F.R.D. 417 (D.N.M. 1988)

13   (antitrust class consisting of all telephone customers in seven states approved). Indeed, Plaintiffs

14   are aware of no significant management difficulties that will be encountered in the litigation on

15   behalf of the class. Quite the opposite -- were each Class member forced to prove the nucleus of

16   the alleged misconduct again and again in dozens, perhaps hundreds, of separate trials, substantial

17   duplication, waste of judicial and party resources, and the risk of inconsistent judgments would

18   occur. *See Nifedipine*, 246 F.R.D. at 371-72; *Upshaw v. Ga. Catalog Sales, Inc.*, 206 F.R.D. 694,

19   701 (M.D. Ga. 2002) ("class action treatment is far superior to having the same claims litigated

20   repeatedly, wasting valuable judicial resources").

21   **IV.    CONCLUSION**

22       For the foregoing reasons, Plaintiffs' respectfully request that the motion for class

23   certification should be granted.

24

25

26

27

28

761383.1

1   Dated: May 5, 2008              By: _____

2
    *On the brief*:                 Daniel Berger
3                                    Email: danberger@bm.net
    Eric L. Cramer                   Eric L. Cramer, *Pro Hac Vice*
4   Daniel C. Simons                 Email: ecramer@bm.net
    Candice J. Enders                Daniel C. Simons
5   **BERGER & MONTAGUE, P.C.**      Email: dsimons@bm.net
                                     Candice J. Enders
6                                    Email: cenders@bm.net
    John D. Radice                   **BERGER & MONTAGUE, P.C.**
7   **KAPLAN FOX**                   1622 Locust Street
    **& KILSHEIMER, LLP**            Philadelphia, PA 19103
8                                    Telephone: (215) 875-3000
                                     Facsimile: (215) 875-4604
9
                                     *Counsel for Plaintiff Rochester Drug Cooperative, Inc.*
10
                                     Linda P. Nussbaum, *Pro Hac Vice*
11                                   Email: lnussbaum@kaplanfox.com
                                     John D. Radice, *Pro Hac Vice*
12                                   Email: jradice@kaplanfox.com
                                     **KAPLAN FOX & KILSHEIMER, LLP**
13                                   850 Third Avenue, 14th Floor
                                     New York, NY 10022
14                                   Telephone: (212) 687-1980
                                     Facsimile: (212) 687-7714
15
                                     *Counsel for Plaintiffs Meijer, Inc. and Meijer Distribution,*
16                                   *Inc.*

17                                   Bruce E. Gerstein, *Pro Hac Vice*
                                     Email: bgerstein@garwingerstein.com
18                                   Noah H. Silverman, *Pro Hac Vice*
                                     Email: nsilverman@garwingerstein.com
19                                   **GARWIN GERSTEIN & FISHER, LLP**
                                     1501 Broadway, Suite 1416
20                                   New York, NY 10036
                                     Telephone: (212) 398-0055
21                                   Facsimile: (212) 764-6620

22                                   *Counsel for Plaintiff Louisiana Wholesale Drug Co., Inc.*

23

24

25

26

27

28

761383.1

PLAINTIFFS' MEM. CLASS CERTIFICATION
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

Joshua P. Davis (State Bar No. 193254)
Email: davisj@usfca.edu
**LAW OFFICES OF JOSHUA P. DAVIS**
437A Valley Street
San Francisco, CA 94131
Telephone: (415) 422-6223

*Additional Counsel for Plaintiff Rochester Drug
Cooperative, Inc.*

Joseph M. Vanek, *Pro Hac Vice*
Email: jvanek@vaneklaw.com
David P. Germaine, *Pro Hac Vice*
dgermaine@vaneklaw.com
**VANEK, VICKERS & MASINI, P.C.**
111 South Wacker Drive, Suite 4050
Chicago, IL 60606
Telephone: (312) 224-1500
Facsimile: (312) 224-1510

*Additional Counsel for Plaintiffs Meijer, Inc. and Meijer
Distribution, Inc.*

John Gregory Odom, *Pro Hac Vice*
Email: greg@odrlaw.com
Stuart E. Des Roches, *Pro Hac Vice*
Email: stuart@odrlaw.com
John Alden Meade, *Pro Hac Vice*
Email: jmeade@odrlaw.com
**ODOM & DES ROCHES, LLP**
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Telephone: (504) 522-0077
Facsimile: (504) 522-0078

David P. Smith, *Pro Hac Vice*
Email: dpsmith@psfllp.com
W. Ross Foote, *Pro Hac Vice*
Email: rfoote@psfllp.com
**PERCY SMITH & FOOTE, LLP**
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Telephone: (318) 445-4480
Facsimile: (318) 487-1741

761383.1

PLAINTIFFS' MEM. CLASS CERTIFICATION
CASE NOS. C 07-5985 CW; C 07-6010 CW; C 07-6118 CW

1

2    Tucker Ronzetti, *Pro Hac Vice*
     Email: tr@kttlaw.com
3    Adam Moskowitz, *Pro Hac Vice*
     Email: amm@kttlaw.com
4    **KOZYAK TROPIN & THROCKMORTON**
     2800 Wachovia Financial Center
5    200 South Biscayne Boulevard
     Miami, Florida 33131-2335
6    Telephone: (305) 372-1800
     Facsimile: (305) 372-3508

7    Andrew E. Aubertine, *Pro Hac Vice*
     Email: aa@adr-portland.com
8    **AUBERTINE DRAPER ROSE, LLP**
     1211 S.W. Sixth Avenue
9    Portland, Oregon 97204
     Telephone: (503) 221-4570
10   Facsimile: (503) 221-4590

11   Paul E. Slater, *Pro Hac Vice*
     Email: pes@sperling-law.com
12   **SPERLING & SLATER**
     55 West Monroe Street, Suite 3200
13   Chicago, Illinois 60603
     Telephone: (312) 641-3200
14   Facsimile: (312) 641-6492

15   *Additional Counsel for Plaintiff Louisiana Wholesale Drug
     Co., Inc.*
16

17

18

19

20

21

22

23

24

25

26

27

28

761383.1